EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Leonides Díaz Urbina<br><br>Acusado Peticionario | Certiorari<br><br>2003 TSPR 123<br><br>159 DPR ____ |

Número del Caso: CC-2003-271

Fecha: 16 de julio de 2003

Tribunal de Circuito de Apelaciones:
                    Circuito Regional I

Juez Ponente:
                    Hon. Dora T. Peñagarícano Soler

Abogado de la Parte Peticionaria:
                    Lcdo. Harry N. Padilla Martínez

Oficina del Procurador General:
                    Hon. Roberto J. Sánchez Ramos
                    Procurador General

Materia: Infracción al Artículo 261 del Código Penal

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

Recurrido

v.                                         CC-2003-271

Leonides Díaz Urbina

Acusado Peticionario

RESOLUCIÓN

San Juan, Puerto Rico, a 16 de julio de 2003

Se deniega la petición de certiorari presentada.

Lo acordó el Tribunal y certifica la Subsecretaria del Tribunal Supremo. Los Jueces Asociados señores Corrada del Río y Rivera Pérez disienten con opinión escrita. El Juez Asociado señor Rebollo López no intervino.

Carmen E. Cruz Rivera
Subsecretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

     Recurrido

         v.

                              CC-03-0271   Certiorari

Leonides Díaz Urbina

     Peticionario

Opinión Disidente emitida por los Jueces Asociados señores Corrada del Río y Rivera Pérez.

San Juan, Puerto Rico, a 16 de julio de 2003.

La Mayoría ha dispuesto del recurso de epígrafe con un no ha lugar a la solicitud de expedición del auto solicitado, declinando ejercer la jurisdicción de este Tribunal sobre el asunto ante nos. Respetuosamente, DISENTIMOS. Lo planteado ante nos presenta la oportunidad de ejercer nuestra jurisdicción para pautar norma jurisprudencial sobre extremos importantísimos del derecho constitucional y el estatutario.

I

Contra el aquí peticionario, licenciado Leonides Díaz Urbina, se presentó una denuncia por infracción al Artículo 261 del Código Penal de

Puerto Rico,[1] por hechos imputados como ocurridos el 20 de junio de 2002. Se determinó causa probable para el arresto por dicho delito por la honorable Elizabeth Linares Santiago, Juez Municipal. La denuncia[2] presentada lee de la forma siguiente:

> El referido acusado Sr. LEO DIAZ URBINA, en fecha, hora y sitio arriba indicado, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala Superior de San Juan, **ilegal, voluntaria, maliciosa y criminalmente, obrando junto con otros** y sin autoridad en Ley, **perturbaron la paz y la tranquilidad pública del personal, empleados y funcionarios de la Oficina de la Procuradora de la Mujer, al emplear y utilizar fuerza y violencia, consistente en que el aquí imputado en unión a otras personas que lo acompañaban, penetró e irrumpió en la oficina de la Procuradora de la Mujer, ubicada e[n] la Calle Tetuán N[ú]m. 253 del Viejo San Juan, utilizando diferentes partes de su cuerpo, mediante puños, codazos, manotazos, empujones y de forma atropellante, logrando acceso a la antesala de dicha oficina, resultando lesionadas emocional y físicamente varias personas**, siendo esto [sic] hechos contrario [sic] a la Ley, lo que constituye el delito de Motín. (Énfasis nuestro.)

Posteriormente, se celebró la vista preliminar los días 27, 28 y 29 de agosto de 2002, en la cual fue presentada prueba de cargo dirigida a sostener los hechos imputados al aquí peticionario en la referida denuncia, dentro del marco de lo dispuesto en la Regla 23 de Procedimiento Criminal de Puerto Rico[3] y el ordenamiento jurisprudencial vigente. Después de evaluada la prueba de cargo presentada durante la celebración de la vista preliminar, la honorable Lourdes

---

[1] 33 L.P.R.A. sec. 4522.

[2] Apéndice del recurso de Certiorari, pág. 82.

[3] 34 L.P.R.A. Ap. II, R. 23.

Velázquez Cajigas, Juez Superior, determinó que existía causa probable para formular acusación contra el aquí peticionario por el delito de motín, Artículo 261 del Código Penal, <u>supra</u>.[4]

El 9 de septiembre de 2002 fue presentada contra el aquí peticionario acusación por el delito de motín por el honorable José B. Capó Rivera, fiscal, ante el Tribunal de Primera Instancia, Sala Superior de San Juan. El referido pliego acusatorio[5] lee de la forma siguiente:

> El Fiscal formula acusación contra, LEONIDES DIAZ URBINA, por el Artículo 261 del Código Penal, porque allá en o para el día 20 de junio de 2002, y en San Juan, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de San Juan, **ilegal, voluntaria, maliciosa a sabiendas y con intención criminalmente, obrando junto con otros** y sin autoridad en Ley, **perturbaron la paz y la tranquilidad pública del personal, empleados y funcionarios de la Oficina de la Procuradora de la Mujer, al emplear y utilizar fuerza y violencia, consistente en que el aquí imputado en unión a otras personas que lo acompañaban, penetró e irrumpió en la Oficina de la Procuradora de la Mujer, ubicada en la Calle Tetuán número 253 del Viejo San Juan, utilizando diferentes partes de su cuerpo, mediante puños, codazos, manotazos, empujones y de forma atropellante, logrando acceso** a la antesala de dicha oficina, **resultando lesionadas emocional y físicamente varias personas, siendo estos hechos contrario a la Ley.** Lo que constituye el delito de Motín. (Énfasis nuestro.)

---

[4] La celebración de la vista preliminar fue iniciada el 27 de agosto de 2002, ante la honorable Carmen Dolores Ruiz López, quien fue recusada por la representación legal de uno de los imputados de delito, cuya inhibición se produjo ese mismo día.

[5] Apéndice del recurso de <u>Certiorari</u>, págs. 83 y 84.

El 23 de septiembre de 2002, el aquí peticionario presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, solicitud de desestimación de la acusación presentada en su contra por el delito de motín, a través de su abogado, licenciado Harry N. Padilla Martínez.[6] Apoyó su pedimento en la Regla 64 (p) de Procedimiento Criminal de Puerto Rico[7] y lo resuelto por este Tribunal en los casos de Pueblo v. Tribunal Superior, 104 D.P.R. 454 (1975); Rabell Martínez v. Tribunal Superior, 101 D.P.R. 796 (1973); Vázquez Rosado v. Tribunal Superior, 100 D.P.R. 592 (1972); y Martínez Cortés v. Tribunal Superior, 98 D.P.R. 652 (1970).

Arguyó el aquí peticionario ante el Tribunal de Primera Instancia, que **la mera presencia** de una persona durante la ocurrencia de unos hechos, que dan lugar a la acusación contra varias personas por el delito de motín, no es suficiente para concluir que ésta ha cometido tal delito. Es necesario que haya participado en la comisión del mismo. Alegó, que para ello el Artículo 261 del Código Penal, supra, requiere el empleo de **"fuerza o violencia"** o la amenaza de cualquiera de ellas, acompañada esta última de la aptitud para realizarla, entre otros elementos. Añadió, que "para imponer responsabilidad criminal a una persona como autor de un delito es indispensable que ésta haya tomado parte directa en la comisión del delito; instigado, ayudado

---

[6] Íd., págs. 87-92.

o cooperado a cometerlo; haberse valido de una persona inimputable para cometerlo o haber ayudado a los que lo cometieron, en cumplimiento de una promesa anterior". **Adujo, que para que el Ministerio Público pueda lograr la convicción de una persona acusada por el delito de motín tiene que presentar prueba de cargo que establezca que el acusado estaba presente y participó en el motín, cuando se le imputó una participación directa en el mismo.**

Argumentó, además, ante el Tribunal de Primera Instancia que durante la celebración de la vista preliminar hubo ausencia total de prueba sobre el hecho de que el aquí peticionario desplegara **"fuerza y violencia"**, mediante la utilización de partes de su cuerpo, así como que utilizara puños, codazos, manotazos, empujones y que actuara en forma atropellante, mientras estuvo en el lugar de los hechos. Adujo, que la prueba de cargo presentada en esa etapa procesal tampoco estableció que haya resultado lesionada alguna persona por sus actuaciones. Arguyó, además, que de la referida prueba de cargo se puede apreciar ausencia total de prueba de que el aquí peticionario estuviera envuelto en conspiración alguna, o de que incurriera en designio común con otras personas para cometer el delito de motín.

Planteó el aquí peticionario, ante el foro primario, como fundamento para solicitar la desestimación de la acusación presentada en su contra, que se le acusó de forma selectiva y por motivo de haber sido Presidente del Partido

---

[7] 34 L.P.R.A. Ap. II, R. 64 (p).

Nuevo Progresista. Señaló la utilización por el Estado del aparato de procesamiento criminal, activado con el propósito de discriminar en su contra por motivo de sus ideas políticas. Se apoyó en lo resuelto por el Tribunal Supremo de Estados Unidos en los casos de U.S. v. Armstrong, 517 U.S. 456 (1996); Wayte v. U.S., 470 U.S. 598 (1985); Cameron v. Johnson, 390 U.S. 611 (1968).

El 23 de octubre de 2002, compareció ante el Tribunal de Primera Instancia el Ministerio Público con escrito titulado "Réplica a Mociones de Desestimación" suscrito y firmado por el honorable Gabriel V. Redondo Miranda, Fiscal Auxiliar II, adscrito a la Fiscalía de San Juan. Sostuvo en el referido escrito "que es suficiente que el Ministerio Público presente una scintilla de evidencia sobre todos los elementos del delito imputado y la conexión del acusado con ese delito; esto se traduce a que en la vista de la moción bajo la Regla 64 (p), el acusado deberá persuadir al tribunal de que en la vista preliminar hubo una situación de ausencia total de prueba". Expresó, que "es insuficiente el planteamiento de los acusados de que en vista preliminar hubo ausencia total de prueba en el sentido que el aquí compareciente desplegara **fuerza o violencia** mientras estuvo en el lugar. De conformidad con el propio texto del Artículo 261 del Código Penal, supra, es suficiente con perturbar la paz pública mediante la amenaza de emplear fuerza o violencia, acompañada de la aptitud para realizarla en el acto". (Énfasis nuestro.) Añadió el Ministerio

Público que "es patentemente frívola la alegación de los acusados de que deben ser exonerados, pues sólo pretendían hacer cumplir una orden de desplegar las dos banderas en una oficina de gobierno. Los acusados no han demostrado que están autorizados en ley para tomarse en sus manos el hacer cumplir una instrucción de la Gobernadora. Es decir, los acusados no son agentes del orden público y actúan ilegalmente cuando pretenden irrumpir en una dependencia pública para fines ajenos a los servicios que provee al público dicha dependencia. También resulta inmaterial que el desorden público se haya originado en relación con el ejercicio de su derecho a la libertad de expresión. En el ejercicio de ese derecho no se puede incurrir en motín".

El Ministerio Público adujo en su escrito ante el Tribunal de Primera Instancia, para oponerse a la solicitud de desestimación presentada por la parte aquí peticionaria, que el acto que desemboca en un motín no tiene que ser ilegal. Afirmó, que tampoco tiene que ser ilegal el fin que se persigue mediante dicho acto. Lo pertinente es qué ocurrió en la actividad, no como comenzó. Expresó, que un buen número de motines han tenido su origen en el ejercicio de un legítimo derecho de libertad de expresión y asociación, particularmente en el contexto de huelgas, piquetes u otro tipo de protesta social. Añadió el Ministerio Público, que no podían en el curso de la actividad emplear **fuerza o violencia**, o **intimidar** con la **amenaza del uso de tal fuerza o violencia**, con la capacidad

para así actuar, y con ello perturbar la paz pública, pues ello constituye el delito de motín tipificado en el Artículo 261 de nuestro Código Penal. Ello, aún en la suposición de que existía alguna obligación de desplegar las dos banderas en la Oficina de la Procuradora de la Mujer y que los acusados pretendían protestar, en el ejercicio de sus derechos de libertad de expresión y asociación, porque no se había cumplido con la alegada obligación. Expresó, además, el Ministerio Público, que "es inmaterial el que la manifestación del 20 de junio de 2002 estuviera alegadamente amparada en sus derechos constitucionales de libertad de expresión. Como hemos visto, esto no constituye defensa alguna cuando el alegadamente [sic] legítimo ejercicio de un derecho desemboca en alteración a la paz pública por razón de la manera en que se ejercita ese derecho, esto es, con la amenaza o empleo de **fuerza o violencia**". (Énfasis nuestro.)

El Ministerio Público arguyó ante el foro primario que para configurarse el delito de motín bajo nuestro Artículo 261, supra, no es necesario probar la existencia de un acuerdo previo entre los participantes del motín. Lo que requiere es la participación de dos (2) o mas personas. Expresó, que los que se van uniendo a la conducta tumultuosa que perturbó la paz pública se convierten en participantes en el motín, aunque no hubiere acuerdo previo alguno. A esos efectos, sostuvo "que no basta la mera presencia en el lugar del motín, pero es suficiente con cualquier acto de apoyo o instigación para continuar con el tumulto, ello en

vista del Artículo 35 del Código Penal, el cual incluye como autor de un delito a toda persona que de cualquier modo coopera en la comisión del delito".

Alegó el Ministerio Público, que **los elementos constitutivos del delito de motín son**: (1) dos o más personas **obrando juntas**, aunque **sin previo acuerdo**: (2) que **emplean** o **amenazan** con emplear, con la capacidad para ello, **fuerza o violencia**; y (3) **perturbando** así la **tranquilidad pública**. Sostiene que **no son elementos de tal delito** lo siguiente:

> A) que hubiera un acto ilegal al comienzo de la actividad que degeneró en motín, ni
>
> B) que el motín tuviera su origen en una asamblea ilegal, ni
>
> C) que el fin perseguido mediante los actos de motín sea ilegal, ni
>
> D) que hubiera un acuerdo previo entre los participantes, ni
>
> **E) que se hubiera empleado fuerza o violencia (pues es suficiente con la amenaza del empleo de tal fuerza o violencia acompañada con la aptitud para realizarla), ni**
>
> **F) que hubiera "intención" como forma de la culpabilidad bajo el Artículo 14 del Código Penal, pues es suficiente con la negligencia.**
> (Énfasis nuestro.)

Arguyó el Ministerio Público, que el planteamiento de procesamiento selectivo no es propio para ser presentado en etapa de vista preliminar y Regla 64 (p), supra. Señaló, además, que el aquí peticionario no presentó evidencia alguna durante la vista preliminar para sostener tal planteamiento. Expresó, que **todas** las personas que, según

la investigación razonable de buena fe conducida por el Ministerio Público, fueron identificadas y que cometieron el delito de motín han sido denunciadas o referidas a la Oficina del Fiscal Especial Independiente. Adujo, que el aquí peticionario no **alegó ni probó** que **existía alguna persona específica**, de **ideología partidista distinta a la de ellos**, que **haya incurrido en motín en el día y lugar en que se le imputa amotinarse; que el Ministerio Público conociendo su identidad y conducta no haya tomado acción al respecto.** Expresó, que el peticionario tampoco alegó que en alguna situación similar o análoga el Ministerio Público no hubiera investigado y procesado a los autores del motín.

Finalizó su escrito el Ministerio Público expresando lo siguiente:

> En cuanto al acusado Leo Díaz, **la prueba estableció que éste usó fuerza y violencia para irrumpir en la agencia, acto que perturbó la tranquilidad pública.** Ello surge del testimonio del Sr. Roberto García Vázquez. También quedó demostrado que este acusado, **mediante el uso de la fuerza, logró acceso al "lobby"** de la Oficina de la Procuraduría de la Mujer, **contribuyendo en la colocación por la fuerza de la bandera de los Estados Unidos y a la comisión del delito de motín ese día. Como mínimo, la prueba estableció la probabilidad de que el acusado fue co-autor del delito de motín al haber cooperado, ayudado e instigado en la comisión de dicho delito por otras personas.** (Énfasis nuestro.)

El 4 de noviembre de 2002, la parte aquí peticionaria presentó ante el Tribunal de Primera Instancia un escrito titulado "Moción Reiterando Solicitud de Desestimación y en

Réplica a Escrito Presentado por el Estado titulado Réplica a Mociones de Desestimación".[8]

Planteó el peticionario ante el foro primario, que lo alegado por el Ministerio Público en la denuncia, y en la acusación de la cual se solicitó la desestimación, cuyo contenido es similar o igual a la denuncia, no concuerda con lo expresado en su escrito en oposición a la moción de desestimación. **Arguyó, que el Estado por primera vez y en dicho escrito, hizo alusión a que la prueba presentada estableció la probabilidad de que el acusado,** aquí peticionario, **fue coautor del delito de motín al haber cooperado, ayudado e instigado en la comisión de dicho delito por otras personas.** Expresó, **que en esa etapa procesal el Estado por primera vez habló de la ausencia de intención y de la presencia de negligencia criminal. Afirmó, que huérfana la prueba de cargo del elemento de intención "se recurre en forma socorrida a la negligencia criminal". No obstante, adujo que tales argumentos están en conflicto con el texto de la denuncia y del pliego acusatorio del que se solicitó la desestimación. En ambos, adujo, que se alegó intención.**[9]

El 4 de noviembre de 2002, el aquí peticionario presentó un escrito ante el Tribunal de Primera Instancia titulado "Moción Solicitando se Espere por Transcripción

---

[8] Íd., págs. 116-124.

[9] En la denuncia se le imputó al aquí peticionario la conducta alegadamente incurrida en forma "voluntaria" y

para Resolver Moción de Desestimación".[10]  Expresó, que era indispensable la transcripción de la evidencia presentada durante la celebración de la vista preliminar para atender y resolver la moción de desestimación presentada ante el Tribunal de Primera Instancia, Sala Superior de San Juan.

El 18 de noviembre de 2002, el Estado, representado por el Fiscal, honorable Gabriel O. Redondo Miranda, presentó otro escrito ante el foro primario titulado "Segunda Moción en Oposición a Desestimación por la Regla 64 (p) de Procedimiento Criminal".  **Arguyó, que eran errados los argumentos esbozados por la defensa en cuanto a la significación de los términos "fuerza y violencia" que requiere el motín.  La fuerza o violencia a la que se refiere el delito de motín es cualquier conducta susceptible de causar "terror o alarma" en una persona promedio. Afirmó, que no son necesarios actos específicos de fuerza física contra la persona ni contra la propiedad para que quede constituido el delito de motín.  Adujo, que "lo expresado en las acusaciones es inconsecuente porque el tribunal, en vista preliminar, puede determinar causa probable por el delito que la prueba establezca, independientemente del delito imputado o de lo expresado en la denuncia".**  (Énfasis nuestro.)

Arguyó el Ministerio Fiscal en el referido escrito, que no había dicho "que la conducta de los acusados fue

_____
"maliciosa", y en la acusación se le imputó en forma "voluntaria", "maliciosa" y con "intención criminal".

negligente, sino que el delito de motín es uno que puede ser
cometido negligentemente".   Sobre este asunto, expresó el
Ministerio Público lo siguiente:

> ... **La conducta de los acusados fue a todas
> luces intencionales según el Artículo 15 (b) en
> la modalidad de que el sujeto activo conocía que
> como una consecuencia probable de sus actos se
> perturbaría la paz pública.   El problema es que,
> a pesar de que la conducta de los acusados fue
> intencional, el delito de motín es uno que puede
> ser configurado con negligencia.   Por dicha
> razón, no es suficiente como fundamento para
> desestimar el alegar que no hubo "intención".   En
> el ordenamiento jurídico penal de Puerto Rico
> todos los delitos, en principio, son punibles a
> modo de intención o de negligencia.   Para que un
> delito se pueda cometer solamente de forma
> intencional es necesario que el legislador
> específicamente lo cierre a la negligencia
> utilizando lenguaje tal como: intencionalmente,
> voluntariamente, maliciosamente, etc.   Si el
> legislador no utilizó este lenguaje en el delito
> en cuestión, rige el Artículo 14 del Código Penal
> que establece que todo delito se puede cometer
> basándose en intención o negligencia.   Esto
> significa que en Puerto Rico rige un sistema
> abierto a la negligencia que, en principio, hace
> punible negligentemente todo delito a menos que
> el legislador explícitamente rechace esta
> contención.** (Énfasis nuestro.)

Añadió, sobre el mismo tema, lo siguiente:

> ... **Para cerrar el delito a la negligencia sería
> necesario que el legislador lo haga
> explícitamente.   El delito de motín no hace
> referencia alguna a que la conducta debe ser
> intencional o maliciosa.** Por lo tanto, quedando
> claro que en Puerto Rico rige un sistema abierto
> a la negligencia, cabe decir con toda corrección
> que el delito de motín se puede cometer
> negligentemente.   Esta es la realidad de nuestro
> ordenamiento jurídico penal. (Énfasis nuestro.)

No obstante, el Ministerio Público sostuvo que lo
anterior es un **"argumento residual"**, porque el acusado, aquí
peticionario, **no sólo fue negligente, sino que actuó de**

---

[10] Apéndice del recurso de <u>certiorari</u>, págs. 125-127.

**manera intencional.** Afirmó, que el peticionario actuó de manera intencional si ocurrió una de tres cosas: (1) el acusado tiene como su propósito perturbar la paz pública; (2) el acusado conoce que la perturbación de la paz pública es una consecuencia natural de su conducta; o (3) el acusado conoce que la perturbación de la paz pública es una consecuencia probable de su conducta. **Alegó, que el peticionario conocía que su conducta tendría como consecuencia probable la perturbación de la paz pública. Adujo que el delito de motín es uno abierto a la negligencia y el peticionario fue cuando menos negligente, pues debió conocer que su conducta perturbaría la paz pública y aunque se considere que el delito de motín requiere el elemento de intención, la conducta del peticionario efectivamente fue intencional, porque de las circunstancias que rodearon el delito, se desprende que conocía que como consecuencia probable de sus actos podría perturbar la paz pública.** Expresó **"que una persona puede ser participe de un motín con el simple hecho de utilizar la marca o emblema del grupo que se está amotinando".** (Énfasis nuestro.) Afirmó, **que el peticionario fue partícipe del delito de motín, cuyo acto de presencia en el lugar de los hechos se debió a gestos de apoyo a su líder y no a curiosear o a socorrer a las víctimas.** Sostuvo, **que el peticionario "apoyó, ayudó, instigó y cooperó" en la comisión del delito mediante su presencia y actos afirmativos ese día. Añadió, que "la prueba demostró que, como mínimo, los acusados acudieron al**

**lugar para apoyar y cooperar con la conducta allí realizada, conducta que conocían que probablemente podría perturbar la paz pública".** (Énfasis nuestro.)

El 2 de diciembre de 2002, el honorable Heriberto Sepúlveda Santiago, Juez Superior, celebró la vista correspondiente para atender y resolver la solicitud de desestimación presentada por el peticionario. Durante dicha vista, el referido magistrado, las partes y sus abogados observaron el video presentado en la vista preliminar. El incidente fue sometido con una transcripción oficial de los incidentes acaecidos durante la celebración de la vista preliminar, así como una serie de fotografías y el referido video. El Tribunal de Primera Instancia dictó Resolución el 10 de diciembre de 2002, declarando sin lugar la solicitud de desestimación presentada por el aquí peticionario.[11] **Concluyó el foro primario, que la participación activa del aquí peticionario, junto a otros tres (3) acusados, lo convirtió en autor del delito. Determinó, que éste no fue un mero observador. Infirió que el peticionario llegó al lugar en apoyo del doctor Carlos I. Pesquera Morales, para cooperar con éste, y que con sus actos afirmativos "ayudó, apoyó, instigó y cooperó" en la comisión del delito de motín. Concluyó, además, que el testigo, señor Roberto García Vázquez, ubicó al aquí peticionario en el grupo de personas que estaban después de los que se encontraban pegados a la puerta y que tuvo acceso al interior del**

---

[11] Íd., págs. 684-697.

edificio.   Determinó que el video observado durante la vista lo ubicó directamente detrás del doctor Carlos I. Pesquera Morales, utilizando "fuerza y violencia" para lograr acceso a la Oficina de la Procuradora de la Mujer, "cosa que lograron juntos".

El Tribunal de Primera Instancia determinó, que el planteamiento sobre procesamiento selectivo no podía levantarse en la vista preliminar, y menos aún en la moción de desestimación bajo la Regla 64 (p), supra.  Sostuvo que la decisión de a quién y cuándo imputar el delito le corresponde a la Rama Ejecutiva, a través de sus agencias investigativas.  Por tal razón, no atendió ni resolvió el referido planteamiento.

El licenciado Leonides Díaz Urbina presentó ante el Tribunal de Primera Instancia moción de reconsideración a la resolución declarando sin lugar su solicitud de desestimación de la acusación formulada en su contra.[12]  El Tribunal de Primera Instancia emitió resolución declarando no ha lugar la moción de reconsideración.[13]  Presentó una segunda moción de reconsideración,[14] que fue declarada sin lugar.[15]

Inconforme con lo actuado por el Tribunal de Primera Instancia, el licenciado Leonides Díaz Urbina acudió ante el

---

[12] Íd., págs. 698-714.

[13] Íd., págs. 715-716.

[14] Íd., págs. 717-721.

[15] Íd., pág. 722.

Tribunal de Circuito de Apelaciones, mediante recurso de certiorari.[16] Dicho foro le concedió término al Procurador General para expresarse. El licenciado Leonides Díaz Urbina señaló como errores cometidos por el Tribunal de Primera Instancia los siguientes:

> 1. Cometió error el Honorable [sic] Tribunal de [Primera] Instancia al resolver que el delito de motín según tipificado en el Art. 261 del Código Penal, sólo requiere el elemento mental de intención general y no de la intención específica; según estos conceptos son pautados en los Arts. 14 y 15 de dicho Código.

> 2. Cometió error el Honorable [sic] Tribunal de [Primera] Instancia al denegar la Moción de Desestimación presentada por el acusado y peticionario, descartando la figura de la mera presencia, la cual era claramente aplicable al caso, y lo que obligaba a dicho foro a desestimar el pliego acusatorio, pues el mismo estaba cimentado en una determinación de causa probable contraria a derecho; ya que ésta fue efectuada existiendo una ausencia total de prueba.

> 3. Cometió error el Honorable [sic] Tribunal de [Primera] Instancia al negarse a resolver la solicitud de desestimación presentada por el acusado y peticionario, bajo la figura del encauzamiento [sic] selectivo; lo que se traducía en una determinación de causa contraria a derecho.

Arguyó ante el Tribunal de Circuito de Apelaciones el aquí peticionario, que fue erróneo del Tribunal de Primera Instancia interpretar el delito de motín, como está definido en el Código, a los efectos que se trata de un delito de intención general. **Expresó, que los elementos de "fuerza o violencia" o la amenaza de su uso, acompañada de la aptitud para realizarla, son fundamentales en la tipificación del delito de motín, pues presuponen intención específica.**

_____

Adujo que en la interpretación que el Tribunal de Primera Instancia le impartió al Artículo 261 del Código Penal, supra, bajo el cuadro fáctico de autos, incurrió al aplicarlo en un vicio constitucional. Expresó, que la actividad del 20 de junio de 2002 era una de naturaleza político partidista, y que su encausamiento, en ausencia de prueba de "fuerza o violencia" de su parte, se tradujo en una restricción de los derechos que le garantiza la Primera Enmienda de la Constitución de Estados Unidos. Alegó, que el Estado puede legítimamente intervenir con la expresión de un ciudadano, cuando exista un interés o propósito de salvaguardar el orden público y evitar que esa persona, en designio común con otro, en el uso de "fuerza o violencia" o amenaza de su uso, acompañado de aptitud para su uso, tengan la "intención y el propósito específico" de perturbar la tranquilidad pública. Afirmó, que del pliego de la denuncia, en el cual se alegó que la conducta del aquí peticionario fue "ilegal, voluntaria, maliciosa y criminalmente", se le imputó "intención específica". Sostuvo, que bajo ninguna circunstancia se puede avalar la conclusión del foro primario de que el delito de motín, tal y como está redactado en nuestro Código Penal, sea uno de intención general.

El peticionario señaló ante el Tribunal de Circuito de Apelaciones que el Tribunal de Primera Instancia tuvo ante sí, para resolver su solicitud de desestimación, la

---

[16] Íd., págs. 49-722.

transcripción de los incidentes acaecidos durante la celebración de la vista preliminar los días 27, 28 y 29 de agosto de 2002; cincuenta y seis (56) fotos presentadas por el Ministerio Público y un video editado que no contiene audio, cuya duración es de aproximadamente un minuto. Señaló, además, que el Tribunal de Primera Instancia le imprimió una gran importancia al contenido del referido video para sostener su dictamen, declarando no ha lugar la solicitud de desestimación. Sobre este asunto, el aquí peticionario hizo alusión en su recurso de <u>certiorari</u>, refiriéndose a expresiones del Tribunal de Primera Instancia contenidas en su dictamen, a lo siguiente:

> Si entendiéramos que su participación refleja una mera presencia, ya con anterioridad hubiésemos desestimado este cargo, **pero la prueba, a nuestro juicio, no refleja eso y sí en cambio demostró una participación activa en los hechos, específicamente al momento de intentar tener acceso a las escaleras del interior de la oficina.**

> La posición de la defensa, a los efectos de que su partición [sic] (señor Díaz Urbina) fue "luego de que empleados de la Oficina de la Procuraduría de la Mujer abrieran la puerta del frente de dichas facilidades, este [sic] caminó de la calle, la acera y pisó el interior de dicha facilidad gubernamental" no está sostenida por la prueba. **Solo [sic] bastaría referirnos al video admitido y podemos ver la participación activa del señor acusado estando directamente detrás del señor Pesquera Morales.** En este particular no podemos compartir la apreciación del compañero que representa al señor Díaz Urbina a los efectos de que lo único que se le ve es entrando a las facilidades en unión otras personas. (Énfasis nuestro.)

El peticionario señaló al Tribunal de Circuito de Apelaciones que, en aras de ser lo más preciso posible, gestionó y obtuvo, por orden del Tribunal de Primera

Instancia, copia del video presentado en evidencia. El contenido de ese video fue transferido a una computadora y el mismo se reprodujo en fotos. Esas fotos fueron presentadas ante el Tribunal de Primera Instancia. Afirmó, que de las fotos puede cotejarse el incidente en detalle y con calma. Expresó, que de las fotos identificadas con los números 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 17, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31,33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53 y 54 **no surge la presencia del aquí peticionario**. Añade, que **se puede apreciar la presencia del peticionario** en las fotos identificadas con los números 14, 15, 16, 18, 19, 32, 37 y 43, en medio de un grupo de personas que entraron a las facilidades de la Oficina de la Procuradora de la Mujer. Señaló, que era cierto que el aquí peticionario estuvo en un momento dado detrás del doctor Carlos I. Pesquera Morales, pero que tal hecho no configura el delito de motín.

Alegó el aquí peticionario ante el Tribunal de Circuito de Apelaciones, que el análisis de la evidencia presentada en la vista preliminar no sostiene las conclusiones del Tribunal de Primera Instancia, a los efectos que el contenido del video que ubicó al aquí peticionario directamente detrás del doctor Carlos I. Pesquera Morales, reflejara que estuviera utilizando **"fuerza y violencia"** para lograr acceso a la Oficina de la Procuradora de la Mujer, y que tal objetivo lo lograron juntos. Afirmó, que tal

situación no lo demostró el video, las fotos, ni los testimonios.

Señaló el licenciado Díaz Urbina, que de un análisis de la evidencia no se desprende su **"participación activa" como autor del delito de motín**, tal y como concluyó el Tribunal de Primera Instancia. Afirmó, que en el caso de autos, **la evidencia no demostró un designio común del peticionario con otra persona dirigido a la comisión del acto antijurídico. Tampoco fue alegado en la denuncia el elemento de designio común.**

Arguyó el peticionario ante el foro intermedio apelativo, **que la evidencia en ningún momento demostró su participación en acto alguno dirigido al empleo de "fuerza o violencia", que resultara en la perturbación de la tranquilidad pública.** Afirmó, además, que la evidencia presentada estuvo huérfana de lo alegado, a los efectos de que el peticionario utilizara diferentes partes de su cuerpo para lograr acceso a las facilidades de la aludida oficina. Menos aún, que usara puños, codazos, manotazos, empujones o que actuara en forma atropellante como alude la denuncia. Señaló como errónea, a base de la evidencia presentada, la conclusión del Tribunal de Primera Instancia, a los efectos de que podía inferir válidamente que el aquí peticionario llegó al lugar de los hechos en apoyo del doctor Pesquera para cooperar con éste, y que con sus actos afirmativos "apoyó, instigó y cooperó" en la comisión del delito de motín.

El peticionario planteó ante el Tribunal de Circuito de Apelaciones, **como error del foro primario, no haber atendido su alegato sobre encausamiento selectivo junto a otras personas, todos líderes prominentes del Partido Nuevo Progresista. Señaló, que de un examen de la totalidad de la evidencia desfilada surge que en el lugar habían "más de 100" personas y estaban "pilladas". No obstante, afirmó, que el Estado, a través de la Policía y el Departamento de Justicia, sólo sometió a un proceso criminal al peticionario y a otros tres (3) líderes del Partido Nuevo Progresista. Arguyó, que el momento indicado, a tenor con la Regla 64 de Procedimiento Criminal,[17] para solicitar la desestimación de la acusación es "mediante moción presentada al hacerse alegación de no culpable o antes de alegar". Si no lo plantea en ese momento, "constituirá una renuncia de la misma". Sostuvo, que la propia prueba presentada por el Ministerio Público evidencia lo alegado, de que ha sido encausado selectivamente. Señaló que en el lugar de los hechos periodistas incurrieron en infracción al delito de daños a la propiedad, y que empleados de la Oficina de la Procuradora de la Mujer incurrieron en infracción al delito de agresión y no han sido encausados.**

El Tribunal de Circuito de Apelaciones le concedió al Procurador General término para expresar su posición respecto al recurso de Certiorari.[18]

---

[17] 34 L.P.R.A. Ap. II, R. 64.

[18] Apéndice del recurso de Certiorari, pág. 24.

Con fecha del 25 de febrero de 2003, la Oficina del Procurador General presentó ante el Tribunal de Circuito de Apelaciones documento titulado "Escrito en Cumplimiento de Orden",[19] suscrito por el honorable Roberto Sánchez Ramos, Procurador General de Puerto Rico. Señaló, **"que el delito de motín tipificado en el Artículo 261 del Código Penal no es uno de intención específica".** Afirmó, que **"cabe, pues, el motín por conducta negligente, esto es, emplear fuerza o violencia (o amenazar emplearla con la aptitud para así hacerlo) negligentemente con el efecto de perturbar la tranquilidad pública".** (Énfasis nuestro.) **Arguyó, que el delito de motín no contiene referencia a un estado mental. Puntualizó, que ello significa que para determinar cuál es el <u>mens</u> <u>rea</u> que exige el delito de motín es necesario acudir al precepto penal contenido en el Artículo 14 del Código Penal de Puerto Rico.**[20] Dicho estatuto, aplicado al delito de motín, según el Procurador General, **"deja claro que la acción u omisión que resultare en el delito de motín puede ser cometida tanto con intención como con negligencia".** (Énfasis nuestro.)

Por otro lado, arguyó el Procurador General que **"en el caso de marras es suficiente con que el imputado, en unión a otras personas, incurriera en acciones u omisiones que resultaron en perturbación de la tranquilidad pública. No es necesario que el imputado hubiera dirigido su acción u**

---

[19] Íd, págs. 25-48.
[20] 33 L.P.R.A. sec. 3061.

**omisión a perturbar la tranquilidad pública. No es pertinente el "propósito" de la acción u omisión, por más loable que le parezca a muchos. Ni siquiera es necesario que la perturbación de la paz pública sea el resultado natural o necesario del motín resultante. Es suficiente con que la perturbación de la paz pública sea consecuencia <u>probable</u> de la acción u omisión imputada, pues así lo dispone el Artículo 15(b) del Código Penal".** (Énfasis nuestro.)

El Procurador General señaló en su escrito ante el Tribunal de Circuito de Apelaciones que el peticionario se equivocó de foro y lo intima a dirigir su reclamo a la Asamblea Legislativa para que enmienden los Artículos 15 y 261 del Código Penal, <u>supra</u>.

Arguyó el Procurador General al Tribunal de Circuito de Apelaciones, que **"lo que está en juego es si la presencia del acusado en el lugar de los hechos, ya sea explícita o implícitamente, incitó o ayudó a los demás participantes en la situación antijurídica a continuar con el delito".** (Énfasis nuestro.) Sostuvo que **"la presencia del acusado detrás y al lado del señor Carlos Pesquera, no sólo constituía un aliento para que se continuara con la situación antijurídica, sino que además añadía fuerza numérica al grupo que, congregados, perturbaban la paz pública. Nótese que el acusado no llegó al lugar por mera casualidad, como podría ocurrir con los transeúntes que estaban cerca de la Procuraduría de la Mujer cuando se**

desencadenaron los hechos. Tampoco llegó el acusado a detener la situación antijurídica que allí acontecía (o sea, la perturbación de la paz pública). Además, el acusado es un reconocido líder político puertorriqueño, que ha ocupado posiciones de importancia y cuya presencia no puede más que contribuir a caldear los ánimos de los que estaban allí presentes. No se puede inferir otra cosa que no sea el que el acusado llegó al lugar con el fin de aplaudir y apoyar los actos antijurídicos e incrementar la fuerza numérica de los presentes. Esto es suficiente para poder imputarle la autoría de conformidad con el Artículo 35(b) del Código Penal. Se puede razonablemente inferir que su conducta incitó y ayudó a perturbar la paz pública. Las circunstancias que rodearon la conducta del acusado dejan claro su aprobación de la situación antijurídica ahí realizada". (Énfasis nuestro.) Anadió, que "la conducta del acusado era de naturaleza tal que la única inferencia razonable que se puede hacer es que llegó al lugar aprobando la situación antijurídica. El acto del acusado de entrar en la Procuraduría de la Mujer una vez el coacusado Pesquera logró su entrada, fortalece aún más la inferencia de que la llegada del acusado tenía el propósito de ayudar a la perturbación de la paz pública proveyendo fuerza moral y numérica al grupo de manifestantes. Nada más es necesario para considerarlo coautor según las exigencias del Artículo 35(b) del Código Penal". (Énfasis nuestro.)

En cuanto al planteamiento de encausamiento selectivo, el Procurador General señaló que el peticionario no presentó prueba alguna en la vista preliminar o en la vista bajo la Regla 64 (p) de Procedimiento Criminal, supra, para sostenerlo. **No produjo prueba sobre personas de otra colectividad política que incurrieran en la misma conducta y que, conociéndolo el Ministerio Público, no presentó acusaciones contra ellos. Puntualizó que el peticionario tenía que establecer ante el Tribunal de Primera Instancia qué personas no pertenecientes a la clase alegadamente discriminada, incurrieron en igual conducta y no fueron procesados. Afirmó, que tenía que probar el elemento de deliberación, y que no aportó prueba contundente de un propósito discriminatorio.**

El 6 de marzo de 2003, el Tribunal de Circuito de Apelaciones emitió Sentencia, a través del panel compuesto por su Presidenta, la Jueza Rodríguez de Oronoz, la Jueza Peñagarícano (Ponente) y la Jueza Bajandas Vélez, archivada en autos copia de su notificación a las partes el 14 de marzo de 2003.[21] Mediante la referida sentencia confirmó la resolución recurrida.

Concluyó el Tribunal de Circuito de Apelaciones, que **"el Ministerio Público no adviene obligado a demostrar durante la vista preliminar que tiene prueba contra el imputado que establece todos los elementos del delito imputado en la denuncia".** (Énfasis nuestro.) Añadió el

---

[21] Apéndice del recurso de Certiorari, págs. 1-22.

Tribunal de Circuito de Apelaciones que, a nivel de vista preliminar el Ministerio Público no está forzado a probar su caso más allá de duda razonable. Concluyó, además, el foro intermedio apelativo sobre este asunto **"que en la vista preliminar no es necesario que el Estado pruebe a cabalidad todos los elementos del delito imputado, como tendría que hacerlo en la etapa de juicio. Es por ello, que –a modo de ejemplo– el Ministerio Público no tenía que probar en esta etapa, que el peticionario utilizó "las distintas partes de su cuerpo..." para poder cumplir con el quantum de prueba necesario.** Destacó, además, que la prueba de autos, respecto a la probabilidad de participación del peticionario, ha sido aquilatada por magistrados a nivel de Regla 6 y de vista preliminar". (Énfasis nuestro.)

El Tribunal de Circuito de Apelaciones fundamentó su decisión en que el Artículo 261 del Código Penal, supra, según tipificado, **no incluye el elemento de "intención específica" de llevar a cabo la conducta prohibida. Sostiene, que es suficiente la "intención general" de cometer el delito de motín, o sea, que independientemente que de la conducta desplegada no se desprenda que se quería perturbar la tranquilidad pública, basta con que esa sea la consecuencia natural o probable; o que tal resultado hubiese sido razonablemente previsible.** Concluyó, que de la prueba testifical y documental presentada y apreciada por el foro de primera instancia, se desprende que el peticionario fue identificado por varios de los testigos de cargo.

Puntualizó, que de la transcripción contenida en el apéndice de su recurso surge que los referidos testigos de cargo ubicaron al aquí peticionario en los eventos que dan margen al caso de autos. Determinó, que **"para los efectos de la vista preliminar el Ministerio Público cumplió con la evidencia requerida para demostrar la probabilidad de que el imputado participase en los eventos en controversia.** Ello, en consideración de que el peso de la prueba requerido al Ministerio Público en esta etapa es modesta por demás". (Énfasis nuestro.)

Sobre el planteamiento de encausamiento selectivo levantado por el aquí peticionario ante el Tribunal de Primera Instancia, y no atendido y resuelto por el foro primario, expresó el Tribunal de Circuito de Apelaciones lo siguiente:

> **Resulta evidente, que al peticionario le asiste aún la facultad de alegar la aludida defensa con anterioridad al juicio.** Por su parte, el tribunal recurrido podrá atender las alegaciones, a modo de ejemplo, mediante una moción al amparo de la Regla 9 de Evidencia. **El asunto neurálgico lo es, que estamos impedidos de actuar en esta etapa en ausencia de una decisión del Tribunal de Primera Instancia respecto al alegado encausamiento selectivo.** No obstante, precisa destacar que el peticionario deberá presentar su defensa acorde a lo expresado por la jurisprudencia aplicable. Así, el Tribunal Supremo de Puerto Rico ha expresado, que cuando la defensa de encausamiento selectivo se urde en aras de lograr la exoneración de cargos criminales, los tribunales federales han adoptado las siguientes directrices:
>
> **a. El peticionario tendrá que presentar una moción con anterioridad al juicio.**
>
> **b. Será preciso, además, que éste alegue hechos suficientes de forma que la aludida defensa**

"...**rebase la etapa de frivolidad, para que proceda la celebración de una vista evidenciaria...**"

**c. La referida vista se justifica, cuando** "...**se desprende que existen hechos** *tendentes* **a demostrar encausamiento selectivo o que** *levanten dudas* **sobre las motivaciones del Ministerio Fiscal al acusar...**" Pueblo v. Rexach Benítez, *supra*, a la pág. 317.

Lo anterior significa, que primero el imputado tendrá que presentar **alegaciones lo suficientemente meritorias para que sobrepasen la frivolidad; y que de su faz, el Magistrado de Instancia entienda que probablemente se ha discriminado insosteniblemente en contra del mismo. Meras alegaciones son insuficientes** en derecho para sostener la aludida defensa. Pueblo v. Rexach Benítez, *supra*. Sólo entonces, le correspondería al peticionario probar que en efecto el Estado ha actuado en violación a la constitución, y de forma selectiva en contra del imputado.

**El peticionario, pues, tendría que alegar que a personas similarmente situadas no se les procesó criminalmente, además de que las actuaciones del Estado son intencionales y están basadas en la mala fe.** Pueblo v. Rexach Benítez, *supra*, a la pág. 314. (Énfasis nuestro.)

...

Añadió el Tribunal de Circuito de Apelaciones, sobre tal tema, que este Tribunal en Pueblo v. Rexach Benítez,[22] expresó lo siguiente:

... los criterios para determinar **si procede** la consideración de la defensa son totalmente distintos a los que se han establecido para que **progrese la misma.** El **peso probatorio** para establecer **lo segundo** es mucho más oneroso **que el primero.**[23] (Énfasis nuestro.)

---

[22] 130 D.P.R. 273 (1992).

[23] Tal expresión es parte de la Opinión Concurrente y de Conformidad emitida por el Juez Asociado señor Hernández Denton en Pueblo v. Rexach Benítez, supra.

Determinó, que siendo el encausamiento selectivo materia de defensa afirmativa a levantarse en el foro de primera instancia, que conlleva establecer un efecto discriminatorio en la aplicación de la ley a su caso, y que el proceso en su contra fue motivado por esas razones, y considerando que la actuación del Estado está cobijada por la presunción de corrección, corresponde al aquí peticionario alegar y probar lo contrario. **Concluyó, que la alegación de encausamiento selectivo levantada por el peticionario ante el Tribunal de Primera Instancia no era suficiente para que ese tribunal, en la etapa procesal en que se encontraba el caso de autos, desestimara la acusación formulada contra el aquí peticionario.**

Inconforme con lo dictaminado por el Tribunal de Circuito de Apelaciones, el licenciado Leonides Díaz Urbina acudió oportunamente ante este Tribunal, mediante recurso de certiorari.

Por las razones expuestas a continuación, expediríamos el auto solicitado. Disentimos de la inacción de la Mayoría sobre los asuntos de marcada importancia que contiene el asunto ante nos. Veamos.

II

## MOTÍN

**Todo empleo de fuerza o violencia, que perturbare la tranquilidad pública, o amenaza de emplear tal fuerza o violencia, acompañada de la aptitud para realizarla en el acto, por parte de dos o más personas, obrando juntas y sin autoridad de ley, constituye motín,** y toda persona que

participare en un motín será sancionada con pena de reclusión por un término fijo de dos (2) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de tres (3) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un año. (Énfasis nuestro.)

El tribunal, a su discreción, podrá imponer la pena fija de reclusión establecida o pena de multa que no excederá de dos mil dólares o ambas penas.[24]

El Artículo 14 del Código Penal de Puerto Rico[25] dispone lo siguiente:

**Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal.**

**La intención o la negligencia se manifiestan por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona.** (Énfasis nuestro.)

El Artículo 15 del Código Penal de Puerto Rico[26] dispone lo siguiente:

El **delito es intencional**:

(a) Cuando **el resultado ha sido previsto** y **querido** por la persona **como consecuencia** de su **acción** u **omisión** o

(b) Cuando **el resultado, sin ser querido, ha sido previsto por la persona** como **consecuencia natural** o **probable** de su **acción u omisión**. (Énfasis nuestro.)

El Artículo 16 del Código Penal de Puerto Rico[27] dispone lo siguiente:

---

[24] Artículo 261 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4522.

[25] 33 L.P.R.A. sec. 3061.

[26] 33 L.P.R.A. sec. 3062.

[27] 33 L.P.R.A. sec. 3063.

> Responde por **negligencia la persona que ha producido un resultado delictuoso sin quererlo**, por **imprudencia** o **descuido**, o **falta de circunspección** o **impericia** o **por inobservancia de la ley**. (Énfasis nuestro.)

La controversia trabada entre las partes reside, entre otras, en una diferencia abismal en la interpretación que le imprimen a los elementos que configura la tipificación del delito de motín, y cómo han de ser establecidos a nivel de vista preliminar, donde se determina si existe causa probable para formular una acusación por delito grave contra una persona ante la Sala Superior del Tribunal de Primera Instancia.

El Ministerio Público alega que el delito de motín fue establecido en cuanto al aquí peticionario, a nivel de vista preliminar, con una scintilla de prueba. Sostiene que se estableció que el peticionario participó directa y activamente en la conducta delictiva imputada sobre la base que es suficiente probarle que sus acciones, dentro del marco de tal dimensión, produjeron la perturbación de la tranquilidad pública de los empleados de la Oficina de la Procuradora de la Mujer como una consecuencia probable de su conducta, o que era previsible para él que así fuera. En la alternativa, alega que se estableció, en esa etapa de los procedimientos, que el peticionario ayudó, apoyó e instigó a otros de los acusados y cooperó con ellos al éstos desplegar, alegadamente, una participación directa y activa en la conducta delictiva imputada. En esta última modalidad, y con el propósito de ilustración del alcance de

los términos "apoyar, instigar y cooperar", el Ministerio Público indica que una persona podría ser partícipe de un motín con el simple hecho de utilizar la marca o emblema del grupo que se está amotinando. Expresa que no son elementos del delito de motín el designio común de dos o más personas con la intención específica de perturbar la tranquilidad pública con el uso de fuerza o violencia, o la amenaza de su uso, con aptitud para desplegarla. Expresa, que para que un delito requiera el elemento de intención específica, el legislador le tiene que adscribir los términos "voluntaria", "maliciosa" y/o "intencionalmente", en la tipificación y definición del delito. De no haberse incluido dichos términos, es la posición del Ministerio Público, que fue la intención legislativa no requerir tal requisito como elemento del delito. Bastaría con que se pudiera establecer el delito en cuestión probando negligencia y/o intención general. Puntualiza, que la **"fuerza o violencia"** a que alude el estatuto penal en cuestión no se refiere a actos específicos de fuerza física contra los empleados de la Oficina de la Procuradora de la Mujer ni contra la propiedad de éstos, o de esa entidad gubernamental. Basta con que la **"conducta"** desplegada cause **"terror o alarma"** en una persona promedio. Afirma que el delito de motín no requiere que se pruebe que se incurrió en tal **"fuerza o violencia"** en conjunto con un estado mental de propósito de perturbar la tranquilidad pública. Basta, según el Ministerio Público, con que esa sea la consecuencia probable, o que sea

previsible tal resultado en una persona promedio. No obstante, en la denuncia presentada el Ministerio Público alegó que el aquí peticionario incurrió en la conducta delictiva imputada, en la modalidad de participación activa y directa, en una forma **"ilegal, voluntaria, maliciosa y criminalmente obrando junto con otros".** En la acusación que fue objeto de la solicitud de desestimación alegó que incurrió en la misma conducta delictiva previamente imputada en forma **"ilegal, voluntaria, maliciosa, a sabiendas y con intención criminalmente",** obrando con otros. En ambas se describió su participación como una **activa y directa en la utilización de "diferentes partes de su cuerpo, mediante puños, codazos, manotazos, empujones y de forma atropellante".** (Énfasis nuestro.)

El peticionario alega que el motín requiere que se establezca en la vista preliminar, con una scintilla de prueba, todos los elementos del delito, que incluye un designio común de dos o más personas con la **"intención específica"** de perturbar la tranquilidad pública mediante el uso de **"fuerza física o violencia",** o la amenaza de su uso con aptitud para desplegarla. Sostiene que el Ministerio Público no probó en la vista preliminar, con una scintilla de prueba, todos los elementos del delito, así como tampoco sostuvo, en esa etapa de los procedimientos, aquellos elementos del delito imputados en la denuncia, en la que describió la conducta delictiva imputada como voluntaria, maliciosa y desplegada con una participación suya activa y

directa mediante el uso de **"fuerza y violencia"**, a través de los medios ya mencionados. Añade, que tampoco probó el "apoyo, instigación y cooperación" del peticionario con otros de los imputados en la alegada participación directa y activa de éstos en la conducta delictiva imputada.

## PRINCIPIO DE LEGALIDAD

El principio de legalidad es un conjunto de reglas, cuyo común denominador es la justificación para que la intervención del Estado en los asuntos de los individuos, en una sociedad libre y democrática como la nuestra, esté basada en la ley y no en el poder absoluto o en la fuerza bruta. El principio de legalidad es un ideal adoptado por nuestra sociedad como parte de nuestros valores democráticos, relacionado directamente con el derecho a un debido proceso de ley consagrado por la Constitución de Puerto Rico y la de Estados Unidos. Constituye un límite al Poder Legislativo en la formulación de política pública al aprobar estatutos penales. Requiere que en ese ejercicio el legislador tiene que especificar cuál es el ámbito de lo que constituye conducta delictiva.[28]

La premisa básica del principio de legalidad puede resumirse en que la ley escrita es la única fuente del Derecho Penal.[29] La jurisprudencia no es fuente directa de

---

[28] D. Nevares-Muñiz, <u>Derecho Penal Puertorriqueño: Parte General</u>, 4ta ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, Inc., 2000, pág. 69.

creación de derecho penal en Puerto Rico. La función de los tribunales es aplicar e interpretar la ley penal. En algunos casos la jurisprudencia puede dar lugar a normas jurídicas, pero no crea ni cambia la ley penal sustantiva, sólo interpreta la voluntad de la ley. En nuestra jurisdicción existe la doctrina del precedente. Este se refiere a que la norma interpretativa de la ley emana de las decisiones del tribunal de mayor jerarquía en casos y controversias decididos. Esa teoría descansa sobre la aplicación de la norma a unos hechos similares a los que dieron lugar a su formulación.[30]

La costumbre es fuente de interpretación del derecho penal, a modo de excepción en aquellos casos que la ley utilice expresiones amplias y genéricas, cuyo significado tendrá que determinarlo el juzgador usando el lenguaje común y corriente. En estos casos, el Artículo 6 del Código Penal de Puerto Rico[31] dispone que "las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente".[32]

Los principios generales del Derecho, si no se concretan en preceptos de derecho penal escritos, tampoco son fuente del derecho penal por razón del principio de legalidad. Así, por ejemplo, si el hecho no está tipificado

---

[29] Nevares-Muñiz, op. cit., pág. 72; Artículo 8 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3031; Pueblo v. Santiago, 98 D.P.R. 82 (1969).

[30] Nevares-Muñiz, op. cit., págs. 72 y 73.

[31] 33 L.P.R.A. sec. 3021.

como delito, aún cuando esté en oposición a los principios generales de justicia, no generará responsabilidad penal. En el derecho civil los principios generales del Derecho son fuente jurídica supletoria.  No así en el derecho penal.[33]

El principio de legalidad está íntimamente relacionado con el hecho de que en el derecho penal solamente la ley escrita es fuente del derecho.  La fuente de producción del derecho penal es únicamente el Estado, ya que es éste el que puede ejercer la voluntad para dictar normas jurídicas.[34]  En nuestro entorno dicho ejercicio está avalado por la naturaleza democrática de la selección de nuestro Gobierno (Ramas Ejecutiva y Legislativa), y por las limitaciones que le impone la Constitución de Puerto Rico y de Estados Unidos a la autoridad gubernamental frente al individuo en el ejercicio de tal poder.

El Artículo 8 del Código Penal de Puerto Rico, supra, prohíbe la creación de delitos y sanciones por analogía. Dispone dicho estatuto lo siguiente:

> **No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido.**
>
> No se podrán crear por analogía delitos, penas, ni medidas de seguridad.  (Énfasis nuestro.)

---

[32] Nevares-Muñiz, op. cit., pág. 73.

[33] Íd.

[34] Íd.

**Analogía** es la semejanza de una relación.  El término implica un razonamiento previo.[35]  En el derecho penal se reconocen dos tipos de analogía: **la analogía legal** y la **analogía jurídica**.  La **analogía legal** consiste de la aplicación de la ley a un caso no contenido en ella.  Esta se obtiene acudiendo a otro precepto de la ley que regula el caso afín, aplicándolo al caso en cuestión mediante analogía.  La **analogía jurídica** consiste en la aplicación de los principios generales del Derecho.  Esta surge cuando la regla para el caso omitido se deduce del ordenamiento jurídico tomado en su totalidad.[36]

**VAGUEDAD**

El principio de **"nullum crimen sine lege praevia"** impide que alguna persona sea sancionada penalmente, a menos que preceda a su conducta la descripción clara de la misma como delito en un estatuto.  La prohibición de las leyes vagas surge del principio de legalidad y responde al requisito de que las leyes deben dar aviso adecuado de las consecuencias penales de determinada conducta.  Es parte, además, de las limitaciones del poder del Estado frente al derecho constitucional de los individuos a un debido proceso de ley.  De ahí, que la claridad y precisión de una ley de naturaleza penal es condición de su validez.[37]  Existen tres

---

[35] Íd., pág. 75.

[36] Íd., págs. 75-77.

[37] Íd., pág. 109; Pueblo v. Burgos Torres, 120 D.P.R. 709 (1988); Pacheco v. Vargas, Alcaide, 120 D.P.R. 404 (1988).

fundamentos para declarar nula una ley por razón de vaguedad.  Son ellos, (1) que la ley no de a una persona prudente y razonable una advertencia adecuada sobre cuál es la conducta prescrita o prohibida; (2) que la ley propicie su aplicación arbitraria y discriminada; y (3) que la ley intervenga con derechos constitucionales fundamentales.[38]

En Vives Vázquez v. Tribunal Superior,[39] citando a Grayned v. City of Rockford,[40] nos expresamos de la forma siguiente:

> **Es un principio básico del debido procedimiento que una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. Las leyes imprecisas violentan diversos valores importantes.** Primero, porque asumimos que el hombre es libre para elegir entre la conducta legal e ilegal, insistimos que las leyes den a la persona de ordinaria inteligencia una oportunidad razonable para saber qué está prohibido, de modo que pueda actuar en concordancia con ese conocimiento. Las leyes imprecisas pueden engañar al inocente al no proveer un aviso adecuado. **Segundo, si ha de prevenirse la aplicación arbitraria y discriminatoria, las leyes deben proveer normas claras para aquellos que las aplican. Una ley vaga delega, de modo no permisible, cuestiones básicas de política a policías, jueces y jurados para ser resueltas sobre bases subjetivas y** *ad hoc*, **con los consiguientes peligros de aplicación arbitraria y discriminatoria. Tercero, pero relacionado, cuando un estatuto impreciso 'empalma con áreas sensitivas de las libertades básicas garantizadas por la Primera Enmienda' 'opera para inhibir el ejercicio de [esas] libertades'. Los significados inciertos inevitablemente llevan a los ciudadanos a 'permanecer mucho más lejos de**

---

[38] Nevares-Muñiz, op. cit., págs. 109-110; Papachristou v. City of Jacksonville, 405 U.S. 156 (1972); Winters v. New York, 333 U.S. 507 (1948); Lanzetta v. New Jersey, 306 U.S. 451 (1939).

[39] 101 D.P.R. 139, 145-146 (1973); Pueblo v. Hernández Colón, 118 D.P.R. 891, 899 (1987).

[40] 408 U.S. 104 (1972) (40 W.L. 4881).

**la zona ilegal' ...que si las fronteras de las áreas prohibidas estuviesen claramente demarcadas.** (Citas omitidas.) (Énfasis nuestro.)

El examen judicial a utilizar para determinar si una ley es vaga, es si el lenguaje da un aviso definido con respecto a la conducta proscrita de acuerdo al significado y práctica comunes. En ese examen debe considerarse si una persona de inteligencia común puede entender, sin tener que adivinar, el tipo y ámbito de la conducta proscrita o prohibida, así como el sujeto a quien está dirigida. Como se trata de imponer responsabilidad penal, los requisitos de certidumbre del estatuto son más estrictos que los de las leyes civiles. De ahí, que el delito tiene que estar claramente tipificado con todos los elementos definidos de manera inteligible. La ley debe ser lo suficientemente clara y precisa como para satisfacer el debido proceso de ley.[41]

Los tribunales al aplicar el examen sobre la vaguedad de un estatuto penal necesariamente lo interpretan. El hecho de que haya que interpretar la ley no quiere decir que la misma es vaga. Al examinar un estatuto penal no estamos limitados en forma exclusiva al texto de la ley, sino que podemos considerar el contexto de sus términos y la interpretación de la intención legislativa. **El límite al ámbito permisible de interpretación judicial de una ley penal es que no requiera una construcción amplia para salvar**

---

[41] Nevares-Muñiz, op. cit., págs. 110-111.

**su validez, ya que de requerirse tal interpretación el estatuto sería vago.**[42]

Cuando la vaguedad de la ley estriba en que ésta invita a una aplicación arbitraria y discriminatoria, lo que sucede es que la ley, por ser imprecisa, no provee a las personas que la aplicarán criterios adecuados para ejercer su discreción. El problema en estos casos es que resulta peligroso si la Asamblea Legislativa establece una red lo suficientemente grande como para abarcar a todos los delincuentes y le deja a los jueces, policías y fiscales el poder de determinar quién puede ser sujeto de procesamiento criminal y quién no. Ciertamente ello viola el principio de legalidad, el debido proceso y la igual protección de las leyes.[43] No obstante, no debe confundirse una ley vaga que propicia la aplicación discriminatoria con el hecho que toda ley, al ser aplicada, supone el ejercicio de cierta discreción. Los policías deciden si formularán cargos o no, el fiscal si procesará o no y por qué delitos, los jueces determinarán causa probable para arrestar y acusar. Todos esos funcionarios ejercen su discreción al aplicar la ley. **El examen para determinar si la ley es vaga, es si permite su aplicación discriminatoria contra ciertos grupos de personas por no proveer criterios para orientar el ejercicio de la discreción al aplicarla.**[44]

---

[42] Íd., pág. 111.

[43] Íd.

[44] Íd., pág. 112.

**En los casos de vaguedad por amplitud excesiva** el problema no es la mera ausencia de notificación adecuada, **sino que por razón de la aplicación amplia y arbitraria de la ley se restrinjan irrazonablemente y hasta se violen derechos protegidos por la Primera Enmienda de la Constitución de los Estados Unidos y por el Artículo II, Secciones 2 y 3 de la Constitución de Puerto Rico. Por razón del impacto adverso que puede tener una ley penal imprecisa o vaga al ser aplicada sobre derechos protegidos constitucionalmente, el examen judicial es más riguroso en los casos de amplitud excesiva que en los demás casos.** La vaguedad en situaciones de ese tipo es muy costosa. No sólo se infringen los requisitos de aviso razonable y aplicación indiscriminada, **sino que la ley genera una inhibición de conducta constitucionalmente protegida.**[45]

En la esfera federal se ha discutido extensamente la doctrina de la vaguedad de un estatuto. Esta doctrina emerge como consecuencia del principio constitucional que le garantiza a los ciudadanos un debido proceso de ley.[46] La doctrina de vaguedad de una ley se utiliza en la esfera

---

[45] Íd.

[46] Kolender v. Lawson, 461 U.S. 352 (1982); Smith v. Goguen, 415 U.S. 566 (1974); y Grayned v. City of Rockford, supra. Véase, además, W.B. Lochart, Et. Als., The American Constitution, Cases and Materials, Fifth Ed., St. Paul, Minn.: West Publishing Co., 1981; y L.H. Tribe, American Constitutional Law, Second Ed., Mineola, New York: The Foundation Press, Inc., 1988.

federal para evaluar, por ejemplo, leyes que restringen la libertad de expresión, entre ellos, estatutos penales.[47]

La referida doctrina postula, **como un principio cardinal del debido proceso de ley**, que un estatuto es inconstitucional por adolecer de vaguedad, cuando falla en proveerle un aviso razonable a los ciudadanos de las conductas que proscribe, o **cuando no le provee suficientes guías a los funcionarios que están encargados de ponerla en vigor; permitiendo así su aplicación arbitraria y discriminatoria**.[48] Los fundamentos en que se sostiene la doctrina de vaguedad de un estatuto están claramente formulados por el Tribunal Supremo de Estados Unidos en Grayned v. City of Rockford, supra,[49] donde se dispuso lo siguiente:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. **Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen,**

---

[47] City of Chicago v. Morales, 527 U.S. 41 (1999); y R. D. Rotunda and J.E. Nowak, Treatise on Constitutional Law, Substance and Procedure, Third Ed., St. Paul, M.N.: West Group (1999).
[48] City of Chicago v. Morales, supra; Kolender v. Lawson, supra; Smith v. Goguen, supra; Grayned v. City of Rockford, supra.

[49] Págs. 108-109.

> **judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.** (Énfasis nuestro; notas al calce omitidas.)

...

**El permitir que los funcionarios encargados de aplicar una ley penal, o que intervenga con los derechos constitucionales de los individuos, lo hagan de manera arbitraria o caprichosa, y utilizando como único criterio su voluntad o preferencias, es constitucionalmente impermisible.[50] De hecho, es precisamente la posibilidad de que la ley pueda ser aplicada de manera arbitraria y discriminatoria, por no existir guías que delimiten la discreción de los funcionarios gubernamentales, lo que viola el principio constitucional del debido proceso de ley.[51] La importancia de que el legislador establezca guías adecuadas para orientar y limitar la discreción de los funcionarios encargados de implantar las leyes de naturaleza penal o punitiva es tal, que el Tribunal Supremo de Estados Unidos ha resuelto que la premisa más importante de la doctrina de vaguedad de una ley descansa sobre la ausencia de las antes mencionadas guías.[52]** El mejor ejemplo de la importancia que reviste el que existan guías adecuadas en una ley penal lo encontramos en la expresión del Tribunal Supremo de los

---

[50] City of Chicago v. Morales, supra; Kolender v. Lawson, supra; Smith v. Goguen, supra; Papachristou v. City of Jacksonville, supra.

[51] Smith v. Goguen, supra.

[52] Kolender v. Lawson, supra; Smith v. Goguen, supra.

Estados Unidos en <u>Kolender v. Lawson</u>, <u>supra</u>,[53] donde se

dispuso lo siguiente:

> Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine "is not actual notice, **but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections".** (Citas omitidas.) (Énfasis nuestro.)

Rotunda y Nowak expresan sobre el tema de vaguedad y la

Primera Enmienda de la Constitución de Estados Unidos lo

siguiente:

> Several rationales require special judicial strictness when reviewing laws that regulate fundamental constitutional rights, such as the freedom of speech, assembly, or association, to insure that such regulations are not vague. **First, the requirement that a law place persons on notice as to precisely what activity is made criminal is of special importance when the activity distinguishes between criminal activity and activity that constitutes a fundamental constitutional right. To the extent that the law is vague and relates to fundamental constitutional rights, it might have an "in terrorem" effect and deter persons from engaging in activities, such as constitutionally protected speech, that are of particular constitutional importance. In other words, an unclear law regulating speech might deter or chill persons from engaging in speech or activity with special protection under the Constitution.** On the other hand, an unclear law relating to business property use, such as an unclear zoning statute, would only chill activity without special constitutional significance (until such time as the statute is clarified by appropriate state courts).

---

[53] Págs. 357-358.

**A second, and more important, reason for enforcing the void for vagueness doctrine is to require that there be clear guidelines to govern law enforcement. Without such clear guidelines, law enforcement officers have discretion to enforce the statute on a selective basis. This discretion is most dangerous when the law regulates a fundamental right, such as speech or travel, so that the officers might be subjecting persons to arrest and prosecution either because they disagree with the message that the person wishes to convey in his speech or for some other constitutionally suspect reason.**

**Third, because the First Amendment needs breathing space, the governmental regulation that is tolerated must be drawn with "narrow specificity." Such narrow, clear statutes are more likely to reflect the considered judgment of the legislature that certain speech activities must be regulated.**

**Moreover there is a special danger of tolerating in the First Amendment area "the existence of a penal statute susceptible of sweeping and improper application.... These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." As a result the doctrine consists of a strict prohibition of statutes that burden speech in terms that are so vague as either to allow including protected speech in the prohibition or leaving an individual without clear guidance as to the nature of speech for which he can be punished.**[54]  (Énfasis nuestro.)

Establecidas las bases de la doctrina de la vaguedad de un estatuto, según interpretada en la esfera federal, nos corresponde analizar el tratamiento brindado a dicha doctrina en la jurisdicción local. Veamos.

Al igual que en la esfera federal, la doctrina de inconstitucionalidad por vaguedad de una ley ha sido

discutida en repetidas ocasiones por este Tribunal al analizar la disposición que garantiza el debido proceso de ley en la Constitución de Puerto Rico. Hemos resuelto que una ley adolece de vaguedad si sus prohibiciones no están claramente definidas.[55]

En O.E.G. v. Cordero, Rivera[56] expresamos que una ley es nula por vaguedad, cuando sus prohibiciones no están definidas claramente **o cuando no previenen la aplicación arbitraria de las mismas, por no proveerle al funcionario encargado de su aplicación normas claras y precisas que guíen su discreción.** La doctrina de vaguedad de una ley aplica cuando se trata de estatutos penales, aún cuando los mismos no restrinjan el derecho a la libertad de expresión, y está íntimamente relacionada con el debido proceso de ley garantizado por nuestra Constitución.[57] La doctrina de vaguedad descansa sobre la premisa de que los estatutos deben dar un aviso razonable a la ciudadanía sobre lo que está prohibido y, además, **deben proveer a aquellos que las aplican normas claras que prevengan la aplicación arbitraria o discriminatoria del estatuto.**[58]

---

[54] R.D. Rotunda y J.E. Nowak, Treatise on Constitutional Law: Substance and Procedure, Third ed., St. Paul, Ed. West Group, 1999, Vol. 4, sec. 20.9, págs. 274-276.

[55] Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229 (1988).

[56] Res. el 21 de agosto de 2001, 2001 T.S.P.R. 118, 154 D.P.R. ___ (2001), 2001 J.T.S. 119, pág. 6.

[57] U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153 (1993).

En Pacheco Fraticelli v. Cintrón Antonsanti, supra, establecimos que el Estado y sus subdivisiones políticas tienen la facultad inherente de establecer reglamentación, **pero es su obligación proveer guías y normas adecuadas para evitar la aplicación arbitraria de dicha reglamentación por parte de los funcionarios encargados para ello.** Una ley que no le provee un aviso adecuado al ciudadano de inteligencia común sobre los aspectos que prohíbe, o **que deja la puerta abierta para la aplicación arbitraria y caprichosa de la misma por parte de los funcionarios gubernamentales, viola el principio básico del debido proceso de ley y es nula por vaguedad.**[59]

**Una ley es inconstitucional de su faz no por la forma particular en que se empleó en un determinado caso, sino por la posibilidad de que pueda aplicarse de manera arbitraria o inconsistente en otras situaciones.**[60]

## VAGUEDAD V. INTERPRETACIÓN

Al aplicar una ley a los hechos de un caso presupone un proceso evaluativo del cual se desprenda si puede entenderse por una persona promedio. No existe en realidad ley que no requiera, como cuestión de umbral, ser interpretada al

---

[58] O.E.G. v. Cordero, Rivera, supra, (Op. Concurrente del Juez Asociado señor Corrada del Río, a la cual se unió el Juez Asociado señor Rivera Pérez).

[59] Velázquez Pagán v. A.M.A., 131 D.P.R. 568 (1992); Pacheco Fraticelli v. Cintrón Antonsanti, supra; Vives Vázquez v. Tribunal Superior, 101 D.P.R. 139 (1973).

[60] Íd.

momento de iniciarse el proceso de su aplicación. La interpretación de la ley debe ser adecuada a unos principios jurídicos básicos que orienten al juez en su proceso de aplicarla a unos hechos, conforme al debido proceso de ley y el principio de legalidad. De ahí, la necesidad de unas reglas de interpretación que sean jurídicamente aceptables.[61] Existe una diferencia entre **la vaguedad en un estatuto y una mera ambigüedad.** Cuando una ley **es vaga**, la misma no es susceptible de interpretación para aplicarla a unos hechos. No obstante, si la ley **es meramente ambigua**, procede su interpretación con tal propósito, aplicando las reglas jurídicas apropiadas.

En Vives Vázquez v. Tribunal Superior, supra, citando a Pueblo v. Tribunal Superior,[62] expresamos, sobre el tema, lo siguiente:

> **No debe caerse en la superficialidad de creer que una ley penal es nula por defecto de vaguedad debido a que requiera interpretación.** Como señala el maestro Jiménez de Asúa, todas las leyes, aun las 'clarísimas', requieren interpretación. 'Toda ley, por el hecho de aplicarse es interpretada, ya que al cotejar su contenido con el hecho real se produce un proceso de subsunción, al que contribuyen los órganos interpretativos (a veces el legislador y el científico y siempre el Juez), por procedimientos gramaticales y teleológicos, y con resultados declarativos, restrictivos, extensivos o progresivos.' **En cuanto a las leyes penales 'hay que armonizar la estricta legalidad del Derecho punitivo, con la imprescindible interpretación teleológica de las normas jurídicas. Reconociendo que el Derecho penal tiene carácteres de mayor certidumbre y estabilidad que las otras ramas, es imposible creer que la ley**

---

[61] Nevares-Muñiz, op. cit., págs. 112-113.

[62] 81 D.P.R. 763, 788 (1960).

**penal, *sensu strictu*, se basta del todo a sí misma y que sea suficiente interpretarla a la letra.** No es un sistema completo y sin lagunas, de modo que con el simple procedimiento lógico, basado en los preceptos legales escritos, se puedan resolver todas las cuestiones.' (Énfasis nuestro.)

## REGLAS DE INTERPRETACIÓN VIGENTES EN ESTADOS UNIDOS

El Tribunal Supremo de Estados Unidos le ha imprimido una dimensión muy particular a las normas de interpretación de estatutos penales. El desarrollo de tal tema por ese Alto Foro produjo la norma de interpretación conocida como regla de lenidad ("rule of lenity"). Esta norma de interpretación es aplicada en aquellos casos en que el estatuto penal es ambiguo en un ámbito en particular. El efecto de la misma será no aplicar la ley al acusado o interpretarla lenientemente. Esta regla no puede ser invocada a menos que la ambigüedad sea genuina y que ésta no pueda resolverse de la faz de la ley, ni del examen del historial legislativo. La regla se fundamenta en el debido proceso de ley que requiere que ninguna persona sea obligada a especular, sobre si su conducta está prohibida o no, bajo la inminencia de una acusación; así como también asegurar que la Rama Legislativa utilice la precisión adecuada al demarcar el ámbito de la conducta penal.[63]

---

[63] Nevares-Muñiz, op. cit., págs. 122-123; Dunn v. United States, 442 U.S. 100 (1979); Huddleston v. United States, 415 U.S. 814, 831 (1974); Rewis v. United States, 401 U.S. 808, 812 (1971); Bell v. United States, 349 U.S. 81, 83 (1955).

El Tribunal Supremo de Estados Unidos ha aplicado la regla de lenidad a dos situaciones diferentes. **La primera es cuando el estatuto penal prohíbe cierta conducta y la controversia a resolver es si la actuación del acusado cae dentro del ámbito sustantivo de la prohibición de la ley. Siendo ambiguo el estatuto, si la intención legislativa no es clara, las dudas se resolverán a favor del acusado.** El segundo tipo de asunto en que se ha aplicado la regla de lenidad es aquél en que la controversia es en relación a la severidad y efectos del castigo autorizado por el Congreso de Estados Unidos para un delito en particular, manifestándose la norma en contra de la pena más severa.[64]

**El más Alto Foro de Estados Unidos ha sido claro en que la regla de lenidad no aplica a menos que haya una ambigüedad genuina en la ley, la cual no pueda ser resuelta mediante el análisis e interpretación del lenguaje estatutario y del historial legislativo. No se puede invocar la regla de lenidad para interpretar la ley penal de manera tan restrictiva que derrote la intención obvia de la Legislatura.[65]**

### REGLAS DE INTERPRETACIÓN VIGENTES EN PUERTO RICO

El Código Penal de Puerto Rico de 1974 contiene disposiciones estatutarias relativas a la interpretación en

---

[64] Nevares-Muñiz, op. cit., pág. 123.

[65] Íd., pág. 124; Huddleston v. United States, supra; Callanan v. United States, 364 U.S. 587 (1961).

sus Artículos 6 y 7.[66]  El Artículo 6, supra, adoptó lo que

en las jurisdicciones civilistas se conoce como la norma de

**"interpretación gramatical y declarativa".**  Este tipo de

interpretación equivale en las jurisdicciones del "common

law" a la regla del recto sentido de los términos del

estatuto.  El Artículo 7, supra, incluye definiciones.  La

norma allí consignada se conoce como **"interpretación**

**auténtica contextual".**[67]

El Artículo 6 del Código Penal de Puerto Rico, supra,

dispone lo siguiente:

> **Las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente.**

> Las voces usadas en este subtítulo y el Subtítulo 3 en el tiempo presente incluyen también el futuro; las usadas en el género masculino incluyen el femenino y el neutro, salvo los casos en que tal interpretación resultare absurda; el número singular incluye el plural y el plural incluye el singular.  (Énfasis nuestro.)

El Artículo 7 del Código Penal de Puerto Rico, supra,

dispone lo siguiente:

> **Salvo que otra cosa resulte del contexto, las siguientes palabras y frases contenidas en el presente Código tendrán el significado que se señala a continuación:**

> **(1)** *A sabiendas*.- **Implica conocimiento personal.  No requiere el conocimiento de la ilegalidad del acto u omisión.**

> (2) ...
> (3) ...
> (4) ...

---

[66] 33 L.P.R.A. secs. 3021 y 3022.

[67] Nevares-Muñiz, op. cit., pág. 130.

(5) ...
(6) ...
(7) ...
(8) ...
(9) ...
(10) ...
(11) ...
(12) ...
(13) ...
(14) ...
(15) ...
(16) ...

**(17)  *Ilegalmente*.-    Todo    acto    en contravención de alguna ley, reglamento u orden.**

(18) ...

**(19) *Malicia o maliciosamente*.- Denotan la comisión de un acto dañoso, intencionalmente, sin justa causa o excusa y la consciente naturaleza del mismo.**

(20) ...
(21) ...
(22) ...
(23) ...
(24) ...
(25) ...
(26) ...

**(27)  *Voluntariamente*.-   Aplicada   a   la intención  con  que  se  ejecute  un  acto,  o  se incurre  en  una  omisión,  implica  simplemente propósito  o  voluntad  de  cometer  el  acto,  o  de incurrir  en  la  omisión  a  que  se  refiere.** (Énfasis nuestro.)

(28) ...

Sobre este tema, nos ilustra la profesora Dora Nevares

Muñiz de la forma siguiente:

En la exposición de los cánones de interpretación estatutaria en el derecho penal en Puerto Rico, tenemos que considerar en primer lugar las disposiciones apropiadas del Código Penal de 1902, que estuvo vigente hasta 1974. Luego se considerarán los artículos equivalentes o sustitutivos del Código Penal vigente (Arts. 6 y 7). ...[E]l Tribunal Supremo de Puerto Rico ha incorporado reglas de la jurisdicción civilista

junto con los cánones de interpretación prevalecientes en los Estados Unidos.[68]

En Pueblo v. Arandes de Celis[69] expresamos, sobre el tema, lo siguiente:

> Reiteradamente hemos decidido que un estatuto penal debe ser interpretado **restrictivamente** en cuanto a lo que desfavorece al acusado y **liberalmente** en cuanto a lo que lo favorezca. *Mari Bras v. Alcaide*, [100 D.P.R. 506 (1972] supra, pág. 516; *El Pueblo v. Padilla*, 20 D.P.R. 276 (1914). El Art. 6 del Código Penal de 1974, 33 L.P.R.A. sec. 3021, a su vez dispone que "[l]as palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente". Como podrá observarse, **"junto con la doctrina del recto sentido de los términos se adoptó la política de interpretar la ley de la manera más favorable al acusado *siempre que lo permitiera el lenguaje de la ley y las circunstancias de su aplicación, así como el espíritu e intención de la misma*"**. (Énfasis nuestro.) (Énfasis en el original.) Nevares-Muñiz, *op. cit.*, pág. 11.

> Recientemente en *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404, 410-411 (1988), expresamos que "[l]os estatutos penales deben interpretarse a la luz de la realidad social de donde surgen y operan. Nuestro deber es interpretar las leyes en el contorno de una situación social y económica actual para resolver controversias humanas de profundas implicaciones personales para los afectados y para la comunidad en general.... Nunca debemos olvidar que 'el sentido de hoy no es siempre el sentido de mañana'...[y que l]a interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas...'[nosotros los jueces] no [podemos estar] ajeno[s] a las transformaciones sociales, científicas y jurídicas. *La ley vive y se desarrolla en ambientes que cambian y evolucionan, y si no queremos estarla reformando de un modo frecuente, preciso es que la adapte[mos], como su propia voluntad permite, a las nuevas necesidades de la época.'...  '[Las leyes hay que interpretarlas] a*

---

[68] Íd., págs. 124-125.

[69] 120 D.P.R. 530, 538-539 (1988).

*la luz de las realidades específicas de la sociedad en que opera'*.  (Énfasis en el original y citas omitidas.)

En <u>Pueblo v. Burgos Torres</u>[70] añadimos lo siguiente:

Recientemente en *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988), hicimos acopio de medios interpretativos y nos dimos a la tarea de investigar cuál era el verdadero bien tutelado por el Art. 236 del Código Penal, 33 L.P.R.A. sec. 4432, al resolver la controversia allí planteada.  Dijimos en aquella ocasión que **"[a]l interpretar las palabras del Código Penal y resolver la controversia ante este Foro reiteramos como principio cardinal de hermenéutica que al lenguaje de una ley debe dársele la interpretación que valida el propósito que tuvo el legislador al aprobarla"**.  Expresamos igualmente que **"[e]n buena metodología adjudicativa se debe analizar la ley 'tomando en consideración los fines que persigue...'"**. *Pacheco v. Vargas, Alcaide*, supra, pág. 409.  (Énfasis nuestro.)

. . .

La primera obligación del intérprete consiste en examinar el texto legal para apreciar si su sentido es claro.  . . .

. . .

**La claridad y precisión de un estatuto de carácter penal es condición de su validez en nuestro ordenamiento jurídico**.  Como aspecto del mismo principio debe negarse cabida a la analogía en materia penal.  Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031.  Solamente en casos verdaderamente excepcionales y por la repercusión que en Derecho Penal tienen las normas de otras ramas jurídicas afines, pudiera permitirse la aplicación analógica de un precepto para suplir el vacío de esas normas.  **Este principio impide en materia penal, y so color de interpretación judicial, que los jueces nos lancemos a labores creadoras.**  (Énfasis nuestro.)

**Aclarado este extremo es fácil entender cómo en el campo penal la interpretación realizada por los tratadistas carece de valor obligatorio.  Su fuerza reside en la bondad de los argumentos atemperados, claro está, por el texto claro de la**

---

[70] 120 D.P.R. 709, 714-716 (1988).

**ley. Naturalmente, tienen particular valor las opiniones de aquellos juristas que influyeron en el legislador positivo, como ocurre en Puerto Rico con los profesores José Pagán Rodríguez, José Miró Cardona, Helen Silving, Manuel López Rey, y otros. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, pág. 41 *et seq*. De igual forma, ante el sentido claro de la ley, y sobre todo *cuando las palabras tienen un significado histórico y jurídico ineludible*, la doctrina ofrece en esta área un valioso recurso.** (Énfasis nuestro.)

...

El uso de un diccionario, como fuente para examinar el significado de una palabra, se reconoce como válido en tanto se presume que el legislador lo conoce y que el significado de la palabra que se recoge en la intención legislativa es el uso común, según se define.[71]

Con relación al significado común y corriente de los términos de la ley, sancionado por el Artículo 6 del Código Penal de Puerto Rico, <u>supra</u>, expresa la profesora Dora Nevares Muñiz lo siguiente:

**... El significado del lenguaje común cambia según el cambio social.** Como **el lenguaje jurídico se deriva en gran parte del lenguaje común,** existe la tendencia a proyectar en aquél el nuevo significado sin prestar atención a si el cambio social que produjo la transformación del significado social del término, tiene alguna pertinencia con respecto a la intención de la legislatura, según expresada en la ley. **Al dejar que el significado de la ley sea el que prevalezca al momento de su aplicación, en vez del que prevalecía al momento de promulgar la ley, podría presentarse un problema de aplicación *ex post facto* de una ley, ya que la ley se ha hecho depender de las contingencias del desarrollo linguístico [sic] de la sociedad.**

---

[71] Nevares-Muñiz, <u>op. cit.</u>, pág. 131; <u>Pueblo v. Arandes de Celis</u>, <u>supra</u>.

**Para resolver tal problema debe tomarse en cuenta que, la norma de la interpretación más favorable para el imputado, es parte del debido proceso de la ley y del principio de legalidad. No puede dejarse que la expresión que se haga respecto al significado que se le va a dar a los términos de la ley, en caso de conflicto, sea la que haga el juez al interpretarla luego de realizarse la conducta en controversia. En este caso, tendríamos la situación prohibida por el Tribunal Supremo de los Estados Unidos en *Bouie v. City of Columbia*, 378 U.S. 347 (1964); también en *Rabe v. Washington*, 405 U.S. 313 (1972); y *Marks v. United States,* 430 U.S. 188 (1977).**

**Otra manera de resolver el problema planteado por Silving, respecto al cambio en el significado de los términos, será aplicando la regla de lenidad, según desarrollada por el Tribunal Supremo federal. En este caso se interpretaría el término, cuyo significado ha cambiado, lenientemente, o sea favoreciendo al acusado. Véase *supra*, § 4.5.3.**

Distíngase que en Puerto Rico, el Tribunal Supremo ha indicado que al interpretar las leyes se debe tomar en consideración la evolución natural para las distintas épocas. *Pacheco v. Vargas Alcaide*, 120 D.P.R. 410. Esta opinión cita afirmativamente a Jiménez de Asúa, *La Ley y el Delito*, p. 119, quien indica que el juez no puede estar ajeno a las transformaciones sociales, científicas y jurídicas, por lo que debe estar atento a cómo la ley se desarrolla en unos ambientes que van cambiando. **Como se ha dicho antes, esto podría ser muy peligroso si en el proceso de interpretación se alejara el juzgador de la política pública y de la intención legislativa que se plasmó en la ley al momento de su aprobación, lo cual podría convertir la ley en una de aplicación *ex post facto* y además violar el principio de legalidad.**

**La presencia en el Código Penal de Puerto Rico de términos que tienen una connotación moral, sin estar previamente definidos, podría prestarse a aplicación discriminatoria ya que se le ha dejado su interpretación a las personas encargadas de aplicar la ley, es decir, policías, fiscales y jueces.** Ejemplos en el Código, de este tipo de términos son los siguientes: buena reputación moral (Art. 101-seducción); proposición obscena (Art. 107); deshonrar, desacreditar, honradez, integridad y buena fama

(Art. 118-difamación); lenguaje grosero y paz pública (Art. 260-Alteración a la paz).[72] (Énfasis nuestro.)

El Artículo 7 del Código Penal de Puerto Rico, _supra_, incluye en su texto varias definiciones para ser utilizadas en la interpretación de las disposiciones de ese cuerpo de legislación penal. Por eso las definiciones que contiene tendrán el significado allí descrito,"salvo que otra cosa resultara del contexto".[73]

### III

El Código Penal de Puerto Rico vigente sustenta el principio de que no existe más responsabilidad criminal que aquella que surge de la culpabilidad y divide los delitos en intencionales y negligentes, Artículo 14, _supra_. No obstante, es impreciso en cuanto a la aplicación de la intención o negligencia como el estado mental necesario, de ciertos y determinados delitos allí tipificados. Entre ellos, el delito de motín tipificado en el Artículo 261 del Código Penal, _supra_. No surgen guías para su aplicación ni de su letra ni del historial legislativo. Veamos.

La Comisión de lo Jurídico Penal de la Cámara de Representantes le solicitó al Departamento de Justicia, al inicio de las vistas públicas celebradas para la consideración del P. de la C. 927, que redactara unos comentarios a cada capítulo, sección y artículo del

---

[72] Nevares-Muñiz, _op. cit._, págs. 132-133.

[73] Íd., pág. 133.

propuesto, en aquel momento, Código Penal, de suerte que quedara establecido para el récord legislativo la procedencia y los comentarios teóricos y filosóficos sobre todos sus extremos. Después de realizada una extensa búsqueda, no hemos encontrado que el Departamento de Justicia de Puerto Rico hubiera descargado tal misión.

Durante la discusión en el Senado de Puerto Rico del P. del S. 753, titulado "Para establecer un Código Penal para Puerto Rico y para derogar el Código Penal de Puerto Rico aprobado el 1ro. de marzo de 1902, enmendado", las minorías parlamentarias plantearon la falta de especificidad y detalle del informe rendido por la Comisión de lo Jurídico del Senado al Cuerpo. Sobre este aspecto refleja el Debate Legislativo[74] lo siguiente:

> SR. MENENDEZ MONROIG: Señor Presidente.
>
> SR. PRESIDENTE: Señor senador Menéndez Monroig.
>
> SR. MENENDEZ MONROIG: Señor Presidente, en relación con este informe, como bien explica el compañero Portavoz de la Mayoría, ya que nosotros no hemos tenido la oportunidad de leerlo, el mismo llegó en la tarde de hoy a nosotros; sin embargo, notamos a vuelo de pájaro, que el distinguido compañero Edwin Bello ha hecho una gran labor en preparar este informe. Vemos que han participado en él una serie extraordinaria de juristas puertorriqueños. Sin embargo, lamentamos, señor Presidente, que dado a la premura, a la rapidez conque se nos ha traído este informe, no estamos en condiciones actualmente de poder votar conscientemente sobre esta medida, no tenemos los elementos de juicio necesario para darle nuestra aprobación a esta medida, y le anuncio a nuestros compañeros que esta la [sic] solicita muy respetuosamente, que

---

[74] Debate Legislativo sobre el P. del S. 753, Senado, de 18 de junio de 1974.

se le permita abstenerse por las razones que en este momento hemos expresado.

Señor Presidente, quisiera añadir algo más, si me permite. No sólo este informe se nos entrega en estos momentos, sino que el distinguido compañero que es el portavoz nuestro en la Comisión de lo Jurídico Penal, nos informa que el mismo no fue considerado en Comisión Ejecutiva, lo que también nos obliga, por dicha razón, a abstenernos a la aprobación del mismo.

SR. HERNANDEZ SANCHEZ: Señor Presidente.

SR. PRESIDENTE: Señor senador Hernández Sánchez.

SR. HERNANDEZ SANCHEZ: Señor Presidente, sin ánimos de entrar en debate, no es nuestra intención y voy a ser muy breve.

Primero, tengo que felicitar al compañero Edwin Bello por el esfuerzo que ha hecho. Lo he visto trabajando día y noche, he estado en la Comisión de lo Jurídico Penal considerando este proyecto. El compañero Edwin Bello ha trabajado con gran sacrificio, con gran responsabilidad, a veces sin comer y eso me consta personalmente.

**Pero, señor Presidente, como estamos tratando con una pieza legislativa que quizás dure cien años, tengo que para la historia,** señor Presidente, tomar una decisión en estos instantes sobre este Código Penal por las razones siguientes:

Primero, porque vine a saber, por la Prensa, de que se había radicado un informe y yo soy miembro de la Minoría, soy Portavoz del Partido Nuevo Progresista en la Comisión de lo Jurídico Penal, me interesé personalmente y de ello puede dar fé [sic] el compañero Edwin Bello, que está asintiendo afirmativamente con la cabeza en estos instantes, del interés mío, de la participación mía, por esa razón.

Segundo, no he tenido tiempo de leer el informe, salvo lo que leí en la Prensa.

**Tercero, en cuanto a mi opinión personal, como soy abogado postulante en lo criminal, también en lo civil, pero digo en lo criminal porque se trata del Código Penal y he visto informes, señor Presidente, de piezas**

**legislativas, por ejemplo, del Congreso, que son informes detallados donde van artículo por artículo, yo entiendo, primero, que la Comisión de lo Jurídico Penal se le debió haber dado un "staff" de personas para que preparara un informe exhaustivo, completo, sobre cada artículo del Código Penal.**

Y la razón de ello, señor Presidente y compañeros del Senado, es porque ésta es una pieza legislativa que puede durar cien años, porque el propio informe dispone, que lo empezé [sic] a leer ahorita con el compañero Edwin Bello, **que tuvo la gentileza de empezarme a leer unas enmiendas de su propio Código con anotaciones al calce de su puño y letra, que dice que un Código Penal básicamente tiene que irse transformando en "la marcha", que es la frase que utiliza el informe.**

**Señor Presidente, yo sé que el compañero Edwin Bello tuvo que trabajar en los últimos dos días y ello me consta, de prisa, casi sin dormir, para tener un informe hoy. El compañero Edwin Bello, él sólo [sic] trabajando en ese informe, él sólo; lo cual es muy laudable y yo felicito al compañero Edwin Bello por el sacrificio. Pero yo considero que ese informe, señor Presidente, debió ser preparado por un "staff" pagado por el Senado de Puerto Rico, para que fuera más completo, señor Presidente, más detallado y que el informe incluyera una descripción completa de todo el articulado del Código Penal, artículo por artículo.**

**Desde luego quiero dejar sentado en el record [sic] que yo felicito al compañero Edwin Bello, reconozco su gran trabajo, su conocimiento del derecho penal, su extraordinaria labor. Yo quiero dejar eso en el record [sic]. Sin embargo, no puedo, señor Presidente, porque considero el informe incompleto y por la forma en que ha sido manejado, no puedo votar a favor de las enmiendas. Por lo tanto, vamos a abstenernos.**

Cuando venga tal vez de la Cámara algún Código, tal vez podremos estar aquí tres o cuatro días en Comisión Total estudiando más a fondo el mismo. Gracias, señor Presidente.

SR. BERRIOS MARTINEZ: Señor Presidente.

SR. PRESIDENTE: Señor senador Berríos.

SR. BERRIOS MARTINEZ: Quizás lo que yo diga en este momento cubra también el aspecto de la aprobación del proyecto, porque lo que diría con respecto a las enmiendas en este momento, es más o menos lo que diría con respecto al proyecto.

**Este senador no está en condiciones en este momento, por innumerables razones, algunas de las cuales han mencionado los compañeros, de entrar en el debate cuidadoso, concienzudo, extenso, que merece este Código Penal. No creo que sea la forma adecuada la que ha sido utilizada, sin entrar en las razones de por qué se utilizó esa forma con respecto a este Proyecto. Un Código Penal afecta la vida de los ciudadanos todos, es un recoger de costumbres, y un sentar buenas pautas para las costumbres del futuro, una extraña mezcla del derecho público y del derecho privado, y por lo tanto, es un aspecto de una delicadeza tremenda que se contiene en este tipo de proyecto mucho mas que otro tipo de proyecto de carácter estrictamente público o estrictamente privado sobre los cuales tenemos que parar constantemente en este Senado. Mas sin embargo, yo quiero decir algo para el récord, para que de forma alguna se entienda mi renuencia a participar en este debate por las razones expresadas en el día de hoy, como en desdoro de la labor del compañero Bello. Muy por el contrario, es una pena que un esfuerzo magnífico, bueno, profundo, con las diversas discrepancias que existen entre sus proyecciones y propuestas y las que yo haría, o las que yo me propondría a hacer en enmiendas si se llevara a cabo el debate de la forma en que yo estuviera dispuesto a participar en él, no empece todo eso, creo que el compañero Bello ha hecho una labor extraordinaria, con una gran responsabilidad, y no quiero que en forma alguna se mal interprete mi posición en el día de hoy como en detrimento de la labor del compañero Bello y la de los otros compañeros de Comisión que llevaron a cabo un trabajo en esta área. El esfuerzo del compañero ha sido grande y es una pena que por razones totalmente ajenas al quehacer legislativo normal y corriente que debe prevalecer en un Cuerpo, ese esfuerzo se vea mancillado por la velocidad con que se tiene que considerar en el día de hoy. Yo espero que por un esfuerzo que los compañeros hagan, tanto el compañero Bello como el compañero Portavoz Marcano, quizás, yo estoy seguro que tendremos la ocasión, no sé cómo, de ver a fondo muchas de las cosas que hoy por la razón de la**

**brevedad del tiempo no se pueden llevar a cabo. Yo estoy seguro que ese fue el propósito del compañero Bello en esta materia. Yo no quiero entrar mas a fondo en las razones por las cuales no entraré en el debate hoy porque creo que es innecesario entrar a fondo en ellas. Mis [sic] felicitación mas calurosa al compañero Bello. Esa felicitación conllevaría quizás un voto positivo después de una serie de enmiendas que este servidor tendría, pero en este momento definitivamente no tengo la capacidad moral, vamos a ponerlo de esa forma, "moral" entre comillas, como para poder ejercitar un voto conciente con respecto a este proyecto. Por esas razones, señor Presidente, yo me abstendré en la votación en el día de hoy, y probablemente no tenga que entrar mas en debate en el día de hoy porque no veo la necesidad de ello a la luz de lo que yo he dicho.**

Muchas gracias, señor Presidente.

SRA. MAZARIO DE FERRER: Señor Presidente.

SR. PRESIDENTE: Señora senadora Nazario de Ferrer.

SRA. NAZARIO DE FERRER: Muy brevemente, señor Presidente, para expresar nuestra abstención.

En primer lugar, considero que el pueblo de Puerto Rico y todos los puertorriqueños conscientes y responsables han estado añorando el momento en que Puerto Rico puede contar con un Código Penal comprensivo, creador, justo y práctico. **Dolorosamente este Código Penal no nos da la oportunidad que [sic] discutir línea a línea, y concepto a concepto, como merece la gran trascendencia que tiene este documento para el pueblo de Puerto Rico y para todos y cada uno de los puertorriqueños. Lamento que se haya coartado la oportunidad nuestra de poder lograr eso, porque para nosotros, ese Código Penal crea, proyecta y confirma una subcultura jurídica para este pueblo, y eso de por sí es sumamente importante en la vida de este país.**

**El que se ordene los procedimientos en forma justa y en forma real, es algo que hemos estado esperando por largo tiempo, y que a mi modo de ver, dolorosamente, hoy nos tenemos que abstener de su discusión detallada, juiciosa, e inteligente, como es de esperarse. Sin embargo,**

> **aquí un compañero señaló que él tiene la esperanza de que cuando este Código regrese de la Cámara, por las razones que sean y no queremos entrar en estos detalles de procedimiento legislativo, tengamos entonces la oportunidad de que antes de que se dé el concurso final y total al mismo, podamos participar mas activamente como requiere y merece el proceso legislativo. Queríamos obviamente tener una participación efectiva y activa dentro de ello y haber podido aportar en parte, nuestra mejor intención, por lo menos juicio aplicado al mismo, pero lamentablemente debido a la forma en que se han procesado las cosas, va a ser aparentemente imposible.** Sin embargo, como los compañeros que me han antecedido en la palabra, creo que los esfuerzos que ha hecho el Presidente de la Comisión, el compañero Edwin Bello, han sido esfuerzos de notable encomio y que nosotros tenemos que agradecer y reconocer por encima de las limitaciones y las dificultades procesales. (Énfasis nuestro.)

La función político-criminal del principio de culpabilidad está enmarcada en la limitación del poder estatal. Consideramos que en Puerto Rico todavía no se entiende en toda su magnitud y dimensión la importancia de este principio y las limitaciones del Estado al desplegar su autoridad y aplicarlo sobre el individuo.[75]

La más controversial de las figuras típicas del principio de culpabilidad adoptadas en la Parte General del Código Penal de 1974, es la que el legislador denominó como **"intención"**. El problema reside en las clases de **"intención"**. La **pura, directa, propia** dispuesta por el Artículo 15 (a), <u>supra</u>, y la **presunta, indirecta, impropia,** del Artículo 15 (b), <u>supra</u>.[76] La otra especie de la

---

[75] J.E. Pérez Díaz, <u>Ponencia del Secretario de Justicia sobre la Reforma del Código Penal de Puerto Rico, P. del S. 1229,</u> 62 Rev. Jur. U.P.R. 159, 225 (1993).

culpabilidad es la **"negligencia"** regulada por el Artículo 16 del Código Penal de Puerto Rico, <u>supra</u>.[77]

El profesor Jaime E. Granados Peña expresa sobre el principio de la culpabilidad lo siguiente:

> Si quisiera seleccionar un aspecto de la teoría del delito en el derecho penal de Puerto Rico, donde el carácter "mixto" se manifieste en su grado máximo, dudo que pudiese encontrar un mejor ejemplo que el de la Culpabilidad.
>
> **En efecto, de clara estructura continental o civil es la ubicación de la culpabilidad, la división en eventos categoriales, su concordancia expresa y subordinada al principio de legalidad y sobre todo, las dos especies o formas principales.**
>
> En cambio, **tiene una evidente influencia anglosajona, en cuanto a la preeminencia de lo subjetivo o *mens rea* frente a lo normativo, derivada por lo demás de su terminología,** la intromisión de conceptos del derecho probatorio y la necesaria complementación que debe hacerse con una forma u especie casuística de la parte especial, al igual que la proliferación de los elementos subjetivos del tipo.
>
> Con todo, no siguió la tesis originaria del "common law" relativa a las formas de la culpabilidad ni su receptación norteamericana, y, en particular, lo relacionado con la metodología de la atribución, según es desarrollada en el Código Penal Modelo.
>
> **Cualquiera sea su filiación, lo cierto es que resulta inexplicable, que al regular las formas de la culpabilidad, se incurriese en tantos errores, constituyendo su entuerto mayor – tal vez de todo el *Código Penal de 1974*– la especie intencional. En este sentido, además, muy poco ayuda la jurisprudencia relevante, hasta el extremo que desorienta al intérprete más avisado el enfoque de los casos de *Castañón Pérez, De Jesús, Rivera Rivera, Flores Betancourt y Ruiz Ramos*.**

---

[76] Íd., pág. 228.

[77] Íd., pág. 230.

**Si a lo anterior le agregamos que cuando regula la negligencia –consagrándola como género o especie principal siendo claramente una subcategoría– no sabe uno si dicha formulación original (mezcla de conceptos del derecho italiano, francobelga y alemán) genera una negligencia residual, o viene a ser, un tipo autónomo. Pero ahí no termina todo, ya que al introducir en la Parte Especial, el tipo concreto de la imprudencia crasa o temeraria, no hay forma de saber si lo hizo al estilo español, anglosajón, o latinoamericano.**[78]

Sobre el mismo tema, expresa la profesora Dora Nevares Muñiz lo siguiente:

...

El primer párrafo del artículo 14 sintetiza el **elemento mental delictivo** en dos formas básicas: **intención** o **negligencia criminal.** La definición de esas formas se encuentra en los artículos 15 C.P. y 16 C.P., respectivamente. En *Galarza Soto v. Estado Libre Asociado*, 109 DPR 179 (1979), el Tribunal Supremo indica **que entre la intención** y la **negligencia criminal, al igual** que entre **el dolo** y **la culpa civilista, no existe una separación tajante, sino de grados.**

**En el Código existen, además, delitos** para los cuales el **elemento mental requerido es una forma específica o modalidad de intención,** como por ejemplo la intención de destruir, intención de mutilar, intención de defraudar, maliciosamente, voluntariamente, fraudulentamente, a sabiendas, entre otros. Asimismo, la negligencia puede ser simple o crasa y temeraria.

**NEVARES-MUÑIZ,** *Derecho Penal*, **156, (ed. 1983), 184 (eds. 1994, 1995), 192 (ed. 2000), expresa que el denominador común de los elementos de la culpabilidad en Puerto Rico es una gran falta de sistematización. Lo propio hubiera sido que al redactar el Código de 1974 se formulara consistentemente el elemento mental de los delitos tipo bajo las formas de intención o negligencia.**

---

[78] J.E. Granados Peña, <u>Estudio Comparativo de la Culpabilidad en el Sistema Penal de Puerto Rico</u>, 61 Rev. Jur. U.P.R. 71, 91-94 (1992).

Por otra parte, si bien el Código Penal define algunos de los elementos subjetivos del tipo en su artículo 7, **no dispuso reglas o esquema alguno para utilizar en la consideración de los mismos, como por ejemplo se hizo en el Código Penal Modelo, §2.02.** Incluso, **en ocasiones es necesario acudir a la jurisprudencia para definir alguno de los elementos mentales que aparecen en el tipo delictivo.** Este es el caso de los elementos de premeditación y deliberación, típicos del delito de asesinato. Este hecho se reconoce por el Tribunal Supremo en *Pueblo v. Morales Roque*, 113 DPR 876, 879 (1983) al expresar que **"pocas zonas están revestidas de tanta dificultad como la definición de la *mens rea* requerida para el caso de cualquier delito en particular".**[79] (Énfasis nuestro.)

...

Sobre la imprecisión de nuestro Código Penal expresó, además, la profesora Dora Nevares Muñiz lo siguiente:

...

**El Código tampoco es claro en cuanto al uso preciso del lenguaje, requisito reconocido en el principio de legalidad.** En las secciones que siguen, particularmente al evaluar críticamente los elementos constitutivos de los delitos, se proveerán ejemplos específicos de esta situación. Valga por ahora mencionar que **a través del Código se utilizan diferentes tiempos gramaticales en una misma conducta delictiva.** A veces **el tipo legal comienza indicando la pena a imponer y luego se describe la conducta, mientras que en otros casos es al revés. A través del catálogo de delitos, se usan distintos términos para referirse a lo mismo.** Así por ejemplo, se habla de "toda persona", y "aquél que"; de que "se impondrá pena de", o "será sancionado con pena de". Además de esto, hay varias palabras y frases que son gramatical u ortográficamente incorrectas.

**En cuanto a las definiciones, se han omitido definiciones de gran importancia como es la definición de causalidad, requisito fundamental**

---

[79] D. Nevares-Muñiz, <u>Código Penal de Puerto Rico: revisado y comentado</u>, 7ma ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, Inc., 2001, pág. 27.

**para la configuración de varios delitos del Código Penal. Aunque se proveen adecuadas definiciones de los elementos mentales de intención y negligencia, al tipificar los delitos se hace referencia a otros estados mentales como por ejemplo premeditación, deliberación, intención de defraudar, a sabiendas, malicia, voluntariamente, etc.[80]** (Énfasis nuestro.)

En <u>Pueblo v. Flores Betancourt</u>,[81] expresamos lo

siguiente:

> **Nuestro Código Penal no tiene reglas para determinar qué elemento mental es requerido para cada delito. D. Nevares-Muñiz,** *Derecho Penal Puertorriqueño: Parte General*, **Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, Sec. 5.6.3, pág. 156. Para determinar si un delito es de intención o de negligencia hay que acudir a su tipificación en la parte especial del código. Términos tales como "a sabiendas", "fraudulentamente", "maliciosamente", "voluntariamente", etc. denotan delitos intencionales o dolosos. Íd.**

> **Además de necesitar esta intención general, algunos delitos requieren cierta intención específica para quedar constituidos. ...**

> ...

> Finalmente, debemos recordar **que la intención es una cuestión de hecho** a ser evaluada y determinada por el Jurado o el juez en los casos de juicio por tribunal de derecho. Véase *Pueblo v. Bonilla Ortiz*, 123 D.P.R. 434 (1989). Sin embargo, **la intención es un** *elemento mental*, por lo que en ausencia de manifestaciones del imputado que reflejen su estado anímico, el Ministerio Público sólo puede establecerla con prueba de todas las circunstancias relacionadas con la comisión del delito y de la conducta del imputado. Art. 14 del Código Penal, *supra*. (Énfasis nuestro.)

> ...

---

[80] D. Nevares-Muñiz, <u>Análisis Crítico del Código Penal de Puerto Rico</u>, 24 Rev. Jur. U.I. 5, 17 (1989).

[81] 124 D.P.R. 867, 876, 878 (1989). Opinión del Tribunal emitida por el Juez Asociado señor Hernández Denton.

En <u>Pueblo v. Ruiz Ramos</u>[82] expresamos lo siguiente:

> Para poder determinar si existe responsabilidad penal de una persona por un acto delictivo hay que acudir al Art. 14 del Código Penal, 33 L.P.R.A. sec. 3061, **que establece como formas de culpabilidad la intención o negligencia criminal. La presencia de intención o negligencia criminal completa la configuración de los elementos constitutivos del delito.** La ausencia de éstas convierte la muerte en un accidente desgraciado.

> En el *common law*, la responsabilidad criminal de una persona se configura cuando concurren el ***actus reus*** (la realización de la actividad delictiva) y el ***mens rea*** (**el elemento mental, que se puede manifestar como intención, conocimiento, imprudencia o negligencia**). **"Es difícil generalizar sobre el elemento mental de un delito; ya que varía de delito a delito**, y puede incluso variar en un mismo delito de un elemento físico a otro .... Los tipos principales de culpabilidad mental son (1) **intención,** (2) **conocimiento,** (3) **imprudencia,** y (4) **negligencia."** W.R. LaFave y A.W. Scott, *Handbook on Criminal Law*, citado en D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, pág. 154.

> Tradicionalmente, **el conocimiento** ha formado parte de la definición de **"intención".** Aquel que conoce las consecuencias de sus actos y las desea, o que pudo preverlas aun cuando no las desea, tiene la intención criminal requerida. El hecho de que no exista una distinción clara y tajante entre **intención** y **conocimiento** no tiene consecuencias prácticas mayores, porque "usualmente hay una buena razón para imponer responsabilidad si el acusado deseaba el resultado o solamente lo había previsto". W.R. LaFave y A.W. Scott, *Handbook on Criminal Law*, Minnesota, West Publishing Co., 1972, pág. 197.

> En el *common law*, **la negligencia** requerida para responsabilizar penalmente a una persona es mayor que aquella que se requiere en una acción en daños y perjuicios. Usualmente se exige un mayor riesgo de causar daño o que se conozca o se

---

[82] 125 D.P.R. 365, 383-388 (1990). Opinión del Tribunal emitida por el Juez Asociado señor Hernández Denton.

pudiese prever el riesgo causado. *La negligencia se ha definido como una desviación crasa del estándar de cuidado que un hombre prudente y razonable ejercería si se encontrara en la situación del acusado.* R.M. Perkins y R.M. Boyce, *Criminal Law*, 3ra ed., Nueva York, The Foundation Press, 1982, pág. 848.

La **imprudencia** se reserva para aquellos casos donde, además de existir un mayor riesgo de causar daño, el actor tenía la obligación de haberlo previsto. En estos casos utilizamos **un estándar subjetivo**, el actor conocía el resultado de su acción o "sabía que no conocía si la acción era o no riesgosa y de hecho lo era". LaFave y Scott, *op. cit.*, pág. 213. Sin embargo, **la imprudencia y la negligencia** tienen algo en común. "Cada una requiere un tipo de conducta que representa una desviación crasa del estándar de cuidado de un hombre prudente y razonable." Perkins y Boyce, *op. cit.*, pág. 850.

Por otro lado, en la tradición civilista las **formas de culpabilidad** se dividen en **el dolo** y **la culpa**. **El dolo, la forma de culpabilidad** más grave, a su vez se clasifica en **dolo eventual** y en **dolo directo**.

El **dolo es eventual** "cuando el agente se representa como un posible resultado dañoso y no obstante tal representación no renuncia a la ejecución del hecho, aceptando sus consecuencias". E. Cuello Calón, *Derecho Penal*, 18va. ed., Barcelona, Ed. Bosch, 1980, T. 1, Vol. 1, pág. 444.

En **el dolo directo** "existe la representación que eleva a un deseo expreso de efectuar el acto, queriendo la producción de los resultados. En este caso se configura una voluntad totalmente comprometida con los actos delictivos realizados". Nevares-Muñiz, *op. cit.*, pág. 144.

**La culpa** es aquella desviación de una conducta esperada del hombre prudente y razonable en las circunstancias particulares del caso. "El derecho le sanciona la **ligereza**, **descuido**, **pereza**, o **torpeza** con la cual actúa el sujeto en el discurrir de sus actividades normales." Nevares-Muñiz, *op. cit.*, pág. 146. Cuello Calón, *op. cit.*, pág. 466, establece que existe culpa "cuando obrando sin intención y sin la debida diligencia se causa un resultado dañoso, previsible y penado por ley".

**Para que exista culpa** es necesario: (1) que exista una acción **no intencional y voluntaria**, (2) que la persona haya realizado **el acto sin la prudencia requerida al hombre prudente y razonable** en situaciones similares, y (3) que el resultado dañoso **haya podido ser previsto** por la persona que actúa. Nevares-Muñiz, *op. cit.*, págs. 146-147; Cuello Calón, *op. cit.*, págs. 466-467.

Sin embargo, **la culpa no se da en términos tan abstractos, sino que se manifiesta en cuatro (4) modalidades:** *imprudencia, negligencia, impericia e inobservancia de reglamentos y leyes*.

Se ha definido la **imprudencia** como la realización de un acto que no corresponde a la conducta que exhibiría **el hombre prudente y razonable**. "La **imprudencia** supone una **actividad positiva**, se refiere al **obrar irreflexiblemente sin precaución ni cautela**." Cuello Calón, *op. cit.*, pág. 474.

En contraste, **la negligencia** supone **un no hacer;** equivale a **descuido**. Es la omisión sin la atención requerida en casos similares. Al condenar a una persona bajo la modalidad de **omisión negligente** se le castiga **"por un tolerar o un no actuar en ocasiones en que está obligado por la ley a actuar si quiere ser considerado por el ordenamiento como una persona razonable, madura y responsable de sus actos"**. Nevares-Muñiz, *op. cit.*, pág. 148.

La sociedad ha establecido **una presunción** respecto a la habilidad que tienen algunos profesionales que han recibido adiestramiento especializado al efecto. Si no se realiza el oficio, profesión u ocupación con **la debida prudencia** se estará bajo **la modalidad de impericia**. "Es necesario señalar que no debe confundirse la **impericia** con las modalidades anteriormente descritas de **la imprudencia** y **la negligencia**: el **acto imperito** puede involucrar tanto **acciones negligentes** como **acciones imprudentes,** si se mira desde un estricto punto de vista, como se denota claramente del ejemplo de un médico que acepta hacer una operación para la cual no está preparado. Lo que **distingue a la impericia** de **las modalidades arriba mencionadas** es que se produce un **acto culposo bajo la forma de un oficio, profesión u ocupación** para la cual **se presupone preparado al individuo"**. Nevares-

Muñiz, *op. cit.*, pág. 149.  *Pueblo v. Rivera Rivera*, 123 D.P.R. 739 (1989).

Otra **modalidad** de **la culpa** es aquella conocida como **incumplimiento de reglamentos.** Generalmente se ve en los casos **de reglamentos** que tienden a **la seguridad** y **a la normal convivencia de las personas.**  Cuello Calón, *op. cit.*, pág. 473.

Hemos visto que aun con orígenes distintos, tanto **el derecho anglosajón** como **el derecho civil,** en su desarrollo contemporáneo, han establecido la diferencia existente entre **la negligencia** requerida para lograr **una convicción penal** y aquella necesaria para **una acción de daños y perjuicios.**  Se ha reconocido que **el grado de negligencia requerida en casos de naturaleza penal es mayor que el exigido cuando se trata de acciones civiles.**  Perkins y Boyce, *op. cit.*, págs. 840-849; J. Santos Briz, *La Responsabilidad Civil*, 3ra ed., Madrid, Ed. Montecorvo, 1981, págs. 80-87; S. Soler, *Derecho Penal Argentino*, Buenos Aires, Tipografía Editora Argentina, 1956, T. II, págs. 138-142.

. . .

Nuestra definición de **"intención"** proviene del *common law.*  Como bien señala la profesora Nevares-Muñiz, "[p]ara explicar la **intención general** descrita en el artículo 15, C.P., **no puede acudirse a la doctrina civilista, sino a la del** *common law***, donde tiene su origen** y en particular al principio de *versari in re illicita*, según evolucionó en la doctrina de que toda persona **es responsable por las consecuencias naturales y probables de sus actos".**  Nevares-Muñiz, *op. cit.*, pág. 158.

. . . **hemos adoptado las categorías de culpa** delineadas **por la tradición civilista.**  Nuestro Art. 16 del Código Penal **establece la negligencia criminal** cuando se **"ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley".**  33 L.P.R.A. sec. 3063.  De manera que **"la negligencia puertorriqueña con sus modalidades de imprudencia[,] descuido, impericia, falta de atención o inobservancia de leyes y reglamentos equivale a la culpa civilista".**  Nevares-Muñiz, *op. cit.*, pág. 149.

> Sin embargo, en nuestro derecho penal se requiere un grado mayor de negligencia para sostener una convicción que la necesaria bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Pueblo v. Rivera Rivera*, supra; *Pueblo v. Rodríguez*, 47 D.P.R. 600 (1934); *Pueblo v. Rodríguez*, 70 D.P.R. 23, 29 (1949); *Pueblo v. López*, 77 D.P.R. 607 (1954). Véase, también, D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 31. (Énfasis nuestro.)

> ...

La responsabilidad criminal de una persona se configura cuando concurren la realización de la actividad delictiva ("actus reus") y aquel elemento mental ("mens rea"), ingrediente fundamental este último del principio de culpabilidad. La intervención del Estado con un individuo está limitada en la **aprobación** y **aplicación** de la ley penal por **los principios inseparables de legalidad y de culpabilidad**.[83] Tales principios son parte de los ideales adoptados por la sociedad puertorriqueña como parte de nuestros valores democráticos, relacionados directamente con el derecho constitucional a un debido proceso de ley. Al aprobar legislación, el Estado tiene que ajustarse al principio de legalidad y especificar, o cuando menos establecer guías con estándares explícitos en cuanto al "actus reus" y al "mens rea". De otra forma, existe un potencial de arbitrariedad en la aplicación por el Estado a un individuo de un estatuto penal de naturaleza imprecisa.

---

[83] Colautti v. Franklyn, 439 U.S. 379, 99 S. Ct. 675 (1979); City of Chicago v. Morales, supra.

De la letra del Artículo 261, supra, ni del historial legislativo surge la intención del legislador sobre cuál de las modalidades del principio de culpabilidad ("mens rea") es aplicable al delito de motín. No expresa que la conducta allí tipificada como delito tiene que ser incurrida en forma **"voluntaria"**, **"intencional"**, **"maliciosa"**, **"a sabiendas" o "negligentemente"**. El Ministerio Público sostuvo ante el Tribunal de Primera Instancia que cuando la tipificación del delito, en este caso el de motín, no especifica qué grado de culpabilidad es elemento del mismo para su comisión, es aplicable el de **intención general** en su modalidad de **"consecuencia probable"** y/o el de **negligencia**. Sostuvo que, a tenor con el espíritu de la ley, para que fuera aplicable el elemento de **intención específica** al delito de motín era necesario que el legislador incluyera lenguaje en su tipificación, que dentro de las reglas de interpretación dispuestas en los Artículos 6 y 7, supra, pudieran apuntar a tal conclusión. Expresó, que como no lo hizo, la intención del legislador fue de que el motín se puede cometer aun cuando los imputados de tal delito no deseen ni quieren perturbar la tranquilidad pública. Bastaría con que esa fuera la **consecuencia probable** o el resultado obtenido por su **imprudencia** o **descuido, falta de circunspección** o **impericia, o por su inobservancia de la ley,** al participar activa y directamente en el uso de **fuerza** o **violencia**, o, en la alternativa, por su **ayuda, instigación** y **cooperación** con otros de los imputados en su participación activa y directa

en el ejercicio de **fuerza y violencia.** El Tribunal de Primera Instancia concluyó que el aquí peticionario estaba consciente de que su conducta por **"lo menos podría tener como consecuencia probable, la perturbación de la paz pública, que podría culminar en el delito de motín".** (Énfasis nuestro.) El Tribunal de Circuito de Apelaciones concluyó que el delito de motín no incluye como elemento la intención específica de perturbar la tranquilidad pública. Determinó, **que es suficiente la intención general** en cualquiera de sus dos modalidades o, **en la alternativa, la negligencia como elemento de ese delito.**

Resuelta la controversia entre las partes por el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones, sobre cuáles son los elementos del delito de motín tipificado en el Artículo 261 del Código Penal, supra, es función de esta Curia pasar juicio, como cuestión de umbral, sobre la aplicación por esos dos foros judiciales de los cánones de interpretación judicial aplicables al asunto.

En el proceso de armonizar la estricta legalidad del derecho positivo punitivo con la imprescindible interpretación teleológica del delito de motín, no encontramos, dentro del espíritu de la ley, que fuera el propósito específico del legislador adscribirle a dicho delito la **intención general** en **las modalidades de "consecuencia natural o probable"** o, **en la alternativa, negligencia** al producir un resultado delictuoso **sin quererlo** "por **imprudencia o descuido, o falta de circunspección o**

**impericia**, o **por inobservancia de la ley"**. Tampoco surge del espíritu de la ley que fuera el propósito del legislador adscribirle la **intención específica de perturbar la tranquilidad pública**, por haber sido tal el resultado **previsto** y **querido por la persona** como consecuencia de su conducta. En una situación como la presente, la normativa vigente formulada por el Tribunal Supremo de Estados Unidos, por imperativo del derecho a un debido proceso de ley garantizado por la Constitución de Estados Unidos, nos brinda la solución. Veamos.

¿Es impreciso el delito de motín en cuanto al estado mental aplicable al ámbito en particular que tipifica? A base del examen de su letra y el historial legislativo que hemos examinado, creemos que así es.

La regla de lenidad ("rule of lenity") no puede ser aplicada, a menos que la ambigüedad del estatuto penal sea genuina y **que ésta no pueda resolverse de la faz de la ley, ni del examen del historial legislativo**. Esta regla se fundamenta en la garantía constitucional a un debido proceso de ley de una persona intervenida por el Estado al aplicarle un estatuto penal. Ninguna persona puede ser obligada a especular sobre si determinada conducta está prohibida o no, bajo la inminencia de una acusación, sin que se le especifique en el estatuto penal que se le pretende aplicar, la naturaleza de la actividad delictiva ("actus reus") y el estado mental ("mens rea") aplicable, ingredientes fundamentales, ambos del principio de legalidad. Este

asunto adquiere mayor relevancia e importancia cuando el estatuto penal pretende restringir y/o reglamentar el derecho constitucional a la libertad de expresión. Se le tiene que garantizar a esa persona que la Rama Legislativa utilizará la precisión adecuada al tipificar conducta como delito, demarcando específicamente el "actus reus" y el "mens rea".

En el caso ante nos, tenemos la interrogante sobre cuál de los grados de culpa que establece el Código Penal resulta aplicable al delito de motín. Existiendo duda al respecto sobre qué estado mental es aplicable, por imperativo del derecho constitucional a un debido proceso de ley del aquí peticionario, tendría que resolverse tal asunto en forma favorable a éste.

En <u>Pueblo v. Ríos Dávila</u>[84] expresamos lo siguiente:

> ... **Todas las leyes, incluso las más claras, requieren de algún grado de interpretación.** *Pueblo v. Sierra Rodríguez*, 137 D.P.R. 903 (1995). En cuanto a esa teoría, **es fundamental recordar que al lenguaje de una ley debe dársele la interpretación que valide el propósito del legislador, consciente siempre de sus consecuencias.** *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404,409 (1988). Por esta razón, **"[t]enemos el deber de hacer que el derecho sirva propósitos útiles y evitar una interpretación tan literal que lleve a resultados absurdos"**. (Énfasis en el original.) Íd.
>
> **En el contexto de las leyes penales, el debido proceso de ley exige, como condición para su validez, que los estatutos sean claros y precisos.** *Pueblo v. Mantilla*, 71 D.P.R. 36 (1950). **Conforme al principio de legalidad, los estatutos penales deben ser interpretados de forma restrictiva en cuanto a lo que desfavorece al acusado, y liberal en lo que le favorece.**

---

[84] 143 D.P.R. 687, 696-697 (1997).

**Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031;** *Pueblo v. Rodríguez Jiménez*, **128 D.P.R. 114 (1991).**

**Sin embargo, esto no quiere decir que a la letra de un estatuto deba dársele su significado más restrictivo, o hacer caso omiso a la evidente intención del legislador.** *Pueblo v. Sierra Rodríguez*, supra; *Pacheco v. Vargas*, Alcaide, supra, pág. 410; *Pueblo v. Mantilla*, supra, pág. 44. **No debemos perder de vista que la ley penal "[n]o es, [ni tampoco será nunca] un sistema completo y sin lagunas de modo que con el simple procedimiento lógico, basado en los preceptos legales escritos, se puedan resolver todas las cuestiones".** (Escolio omitido.) *Pueblo v. Tribl. Superior*, 81 D.P.R. 763, 788 (1960).

...

A base de lo antes expuesto y aplicada la regla de lenidad al caso de autos, la conclusión ineludible es que a la actividad delictiva ("actus reus") contemplada por el Artículo 261, <u>supra</u>, habría que adscribirle el estado mental ("mens rea") de intención específica contemplado en el Artículo 15 (a), <u>supra</u>, por ser el más exigente para sostener por el Ministerio Público, y a la misma vez el más leniente o favorable al aquí peticionario.

Sobre el elemento de **"fuerza o violencia",** que es parte de la actividad delictiva ("actus reus") tipificada en el delito de motín, las partes sostienen una intensa controversia. El Ministerio Público expresa que tal elemento del delito no se refiere a actos específicos de esfuerzo físico contra los empleados de la Oficina de la Procuradora de la Mujer, ni contra la propiedad de éstos, o de esa entidad gubernamental. Afirma, que basta con que la conducta desplegada cause **"terror o alarma"** en una persona

promedio. El aquí peticionario es del criterio que tal elemento requiere **esfuerzo físico**, y que así afirmativamente fue alegado por el Ministerio Público contra el aquí peticionario, primero en la denuncia y posteriormente en la acusación.

Regularmente recurrimos al diccionario como fuente confiable para determinar el significado de una palabra, presumiendo que el legislador la conoce.[85] El Artículo 6, supra, que adoptó la norma de **"interpretación gramatical declarativa"** dispone que **"las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente"**. La **interpretación gramatical** se refiere a que el juez examine el **significado gramatical de las palabras** y **la sintaxis de las oraciones** en la ley. Cuando se trata de **términos técnicos**, éstos se deben interpretar dentro del contexto en que aparecen en la ley; si se trata de **vocablos extra jurídicos** que pertenecen al **lenguaje común**, se les dará **el significado que les concede el uso corriente**. Si de ese análisis surge una **interpretación clara y aceptable**, ahí concluye el ejercicio de interpretación. La **interpretación declarativa** se hace cuando **el juez aplica la ley** estableciendo una **correspondencia exacta entre las palabras y el espíritu de la ley**. Este tipo de interpretación puede ser, a su vez, **restrictiva** o **extensiva**. La **restrictiva** consiste en **limitarse a entender las palabras como la única voluntad del**

---

[85] Pueblo v. Arandes de Celis, supra, pág. 539.

**legislador.** La **extensiva** ocurre cuando **la letra de la ley no expresa claramente la voluntad del legislador.**[86] Como parte de **la interpretación declarativa extensiva** está **el principio de que los estatutos penales deben ser interpretados restrictivamente en cuanto a lo que desfavorezca al acusado y liberalmente en cuanto a lo que le favorezca.**[87]

El Diccionario de la Lengua Española publicado por la Real Academia en el año 1970, décimo novena edición, **vigente para la fecha de la aprobación de nuestro Código Penal el 22 de julio de 1974,** define **"fuerza" y "violencia"** de la forma siguiente:

| | | |
|---|---|---|
| **fuerza** | – | **vigor, robustez** y **capacidad para mover una cosa** que **tenga peso** o **haga resistencia;** como para levantar una piedra, tirar una barra, etc. |
| **violencia** | – | calidad de **violento.** Acción y efecto de **violentar o violentarse. Acción violenta** o contra el natural modo de proceder. |
| **violentar** | – | Aplicar **medios violentos** a **cosas** o **personas para vencer su resistencia.** Entrar en una casa u **otra parte contra la voluntad de su dueño.** |
| **violento** | – | **Que esta fuera** de su **natural estado, situación y modo.** Que obra por **ímpetu** y **fuerza.** |
| **violentamente** | – | De **manera violenta.** |

---

[86] <u>Pueblo v. Sierra Rodríguez</u>, 137 D.P.R. 903, 906–908 (1995).

[87] Íd., págs. 908–909; <u>Pueblo v. Arandes de Celis</u>, <u>supra</u>; <u>Mari Bras v. Alcaide</u>, 100 D.P.R. 506, 516 (1972).

El Diccionario de la Lengua Española publicado por la Real Academia Española en el año 1992, vigésima primera edición, **vigente actualmente**, define **"fuerza" y "violencia"** de la forma siguiente:

| | | |
|---|---|---|
| **fuerza** | – | **Vigor, robustez** y **capacidad para mover una cosa** que **tenga peso** o **haga resistencia;** como para levantar una piedra, tirar una barra, etc. **Aplicación del poder físico** o moral. |
| **violencia** | – | Cualidad de **violento**. Acción y efecto de **violentar** o **violentarse**. Acción **violenta** o contra el natural modo de proceder. |
| **violentar** | – | Aplicar **medios violentos** a **cosas** o **personas** para **vencer su resistencia**. Entrar en una casa u **otra parte contra la voluntad de su dueño**. |
| **violento** | – | **Que está fuera** de su **natural estado, situación** o **modo. Que obra con ímpetu y fuerza.** Que se hace **bruscamente, con ímpetu e intensidad extraordinarias**. |
| **violentamente** | – | De **manera violenta**. |

En Pueblo v. Sierra Rodríguez, supra, interpretamos la extensión de la palabra "obra", según ésta es utilizada dentro del contexto del Artículo 188A del Código Penal de Puerto Rico.[88] Ese artículo fue añadido a nuestro Código Penal, mediante la Ley Núm. 63 de 5 de julio de 1988. Existe un historial legislativo con relación a ese estatuto que nos permitió auscultar la intención del legislador fácilmente, por desprenderse de allí claramente su propósito

---

[88] 33 L.P.R.A. sec. 4306a.

específico. **No obstante**, puntualizó, sobre este asunto, el Juez Asociado señor Fuster Berlingeri en su Opinión de Conformidad emitida en ese caso lo siguiente:

> **El precepto de que los estatutos penales deben ser interpretados de forma restrictiva en cuanto a lo que desfavorezca al acusado no es un mero canon de hermenéutica. Se trata más bien de una importante regla de naturaleza normativa, que debe acatarse con rigurosa fidelidad, porque se origina en el más fundamental principio del derecho penal y se apoya en mandatos constitucionales de la mayor jerarquía.**
> **El precepto aludido surge en esencia del principio de la legalidad, sobre el cual se erige nuestro ordenamiento jurídico penal.** Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031. La **interpretación restrictiva** del alcance de los estatutos penales es un corolario del axioma básico contenido de la antigua máxima *nulla poena sine lege*. *Meléndez v. Tribunal Superior*, 90 D.P.R. 656 (1964). **Es también un corolario del mandato constitucional sobre el debido proceso de ley en el ámbito penal, conforme al cual no se puede hacer responsable criminalmente a ninguna persona por una conducta que no podía entender razonablemente que estuviese proscrita.** *Pueblo v. Tribunal Superior*, 81 D.P.R. 763 (1960). **Por estas razones, el precepto en cuestión debe tomarse muy en serio por todos los foros judiciales.** (Énfasis nuestro.)

> ...

La posición del Ministerio Público es que no es necesario demostrar **actos específicos** de **esfuerzo físico** para demostrar el elemento de **"fuerza"** o **"violencia"**, sino que bastaría que la **conducta desplegada** cause **"temor o alarma"** en una **persona promedio**. La edición décimo novena del Diccionario de la Lengua Española de 1974, año en que se aprobó el actual Código Penal, define **"fuerza"** como **la capacidad del robusto y vigoroso para hacer resistencia contra algo o alguien.** No obstante, la edición vigésimo

primera del Diccionario de la Lengua Española de 1992 define **"fuerza"** como **la capacidad del robusto y vigoroso para hacer resistencia contra algo o alguien y la aplicación de poder físico para lograrlo.**

Si aplicáramos la **norma de interpretación gramatical** a los términos **"fuerza"** o **"violencia"**, **"violentar"**, **"violento"**, **"violentamente"**, **vocablos extra jurídicos** que pertenecen al **lenguaje común en Puerto Rico**, tendríamos que imprimirle el alcance de la definición contenida en la edición vigésimo primera del Diccionario de la Lengua Española. De otra forma, actuaríamos en forma contraria a nuestras expresiones en <u>Pueblo v. Arandes de Celis</u>, <u>supra</u>, a los efectos de que es nuestro deber interpretar las leyes en el contorno de una **situación social actual** para resolver **controversias humanas de profundas implicaciones personales para los afectados y la comunidad en general.** Allí, puntualizamos que **"nunca debemos olvidar que el sentido de hoy no es siempre el sentido de mañana".** Añadimos al respecto, que **"la interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas".** (Énfasis nuestro.)

Sobre este aspecto, comenta la profesora Dora Nevares Muñiz, **en un análisis crítico de la norma jurisprudencial antes expuesta,** que al permitir que **el significado de la ley penal sea el que prevalezca al momento de su aplicación, en vez del que prevalecía al momento de promulgar la ley, podría presentarse un problema de aplicación <u>ex post facto</u>**

**de una ley, ya que la ley se ha hecho depender de las contingencias del desarrollo lingüístico de la sociedad.** Este análisis parte de la premisa de que **el significado de la ley penal a aplicarse** sobre la base **del que es prevaleciente** al momento de su aplicación sea **más gravoso o perjudicial al acusado** que **el significado de la ley penal al momento de promulgarse.** Ese no es el caso ante nos. Por el contrario, **el significado actual** de los términos **"fuerza", "violencia", "violentar", "violento"** y **"violentamente"**, le son más favorables al peticionario que **los que prevalecían al momento de promulgarse el Código Penal de Puerto Rico en el año 1974.** El significado actual del término **"fuerza"** presupone **la aplicación del poder físico del robusto y vigoroso con capacidad para hacer resistencia sobre algo o alguien.** Por lo tanto, no es suficiente que la conducta observada por el aquí peticionario cause **"temor o alarma"** sin que se le demuestre el ejercicio de **"fuerza"** o **"violencia"** antes indicado.

En conjunto con la doctrina del **recto sentido de los términos, adoptamos la política de interpretar la ley penal de la manera más favorable al acusado, siempre que lo permitiera el lenguaje del estatuto y las circunstancias de su aplicación, así como el espíritu e intención de la misma.**[89] La norma de **la interpretación más favorable para el imputado** es parte del **debido proceso de ley** y **del principio de legalidad. No podemos permitir** que **el significado que se**

---

[89] Pueblo v. Arandes de Celis, supra.

**le va a dar al lenguaje de un estatuto penal, en caso de conflicto,** sea **el que realice el juez al interpretarla, luego de incurrida la conducta en controversia.** En ese caso, nos ilustra la profesora Dora Nevares Muñiz, estaríamos frente a la situación prohibida por el Tribunal Supremo de Estados Unidos en <u>Bouie v. City of Columbia</u>, 378 U.S. 347 (1964); <u>Robe v. Washington</u>, 405 U.S. 313 (1972) y <u>Marks v. United States</u>, 430 U.S. 188 (1977).[90]

El resultado de la aplicación de **la norma de interpretación gramatical** es que a los términos que utiliza el Artículo 261, <u>supra</u>, de **"fuerza"** o **"violencia"** para describir un elemento de **la actividad o conducta delictiva ("actus reus")** tipificada tiene que impartírsele **el significado más favorable al aquí peticionario**, o sea, que **tendría que demostrar el Ministerio Público,** en la modalidad de **autor inmediato o mediato,** que **"una persona robusta y vigorosa con capacidad para mover algo o alguien" que le haga resistencia, aplicó poder físico para lograrlo.**

Si aplicáramos **la norma de interpretación declarativa** y evaluamos **la correspondencia entre la letra del estatuto y su espíritu,** llegamos a un resultado similar. No surge del historial legislativo que hemos evaluado la intención del legislador en cuanto a la aplicación al delito ante nos, de un grado de culpa específico. Por lo tanto, es imperativo imprimirle una **interpretación declarativa de naturaleza**

---

[90] Nevares-Muñiz, <u>Derecho Penal Puertorriqueño: parte general</u>, op. cit., pág. 132.

**extensiva**. La **letra de la ley tampoco expresa claramente la voluntad del legislador** sobre tal extremo. Por lo que prevalece la aplicación de la **regla de lenidad ("rule of lenity")**, por **imperativo de la garantía constitucional del aquí peticionario a un debido proceso de ley. Tiene que impartírsele al estatuto la interpretación más leniente** o **más favorable** al peticionario.[91]

Las partes sostienen ante nos la controversia sobre el elemento de la actividad delictiva ("actus reus") tipificada, constitutivo de que la conducta allí contemplada tiene que ser realizada por "dos o más personas, obrando juntas y sin autoridad de ley". El Ministerio Público alega que tal lenguaje no implica que el Estado tenga que demostrar el "designio común de dos o más personas" para cometer el delito de motín. De otra parte, el peticionario alega que para cometerse tal delito tiene que demostrarse que dos o más personas incurrieron en la conducta allí tipificada como parte de un "designio común". Sobre tal extremo, nos ilustra la profesora Dora Nevares Muñiz en su análisis editorial sobre el delito de motín lo siguiente:

> Cuando la perturbación a la tranquilidad pública se lleva a cabo por dos o más personas actuando juntas y sin autoridad de ley, estamos ante el delito de motín. La perturbación a la tranquilidad pública se puede realizar utilizando fuerza o violencia, o amenazando con emplear tal fuerza o violencia, acompañada la amenaza de la aptitud para realizarla.
>
> **El Tribunal Supremo ha indicado que no constituye elemento esencial del delito de motín**

---

[91] Nevares-Muñiz, <u>Derecho Penal Puertorriqueño: parte general</u>, <u>op. cit.</u>, pág. 132.

**el que se acuse simultáneamente a los dos o más sujetos activos del delito.** Puede acusarse a uno de ellos y ello será suficiente si se alega que llevó a cabo la conducta prohibida por el tipo legal obrando con dos o más individuos sin autoridad de ley. *Pueblo v. Yoder Hernández*, 101 DPR 360 (1973).

Es un elemento del delito que la conducta constitutiva del motín se lleve a cabo de manera que **se perturbe la tranquilidad pública**, la cual se definió bajo el estado de derecho del Código Penal derogado como **la tranquilidad de un vecindario**. *Pueblo v. Pacheco*, 48 DPR 602 (1935). Con el transcurso del tiempo algunas jurisdicciones han ampliado el delito de motín para incluir perturbaciones a la tranquilidad de lugares que no son vecindarios, como las instituciones de reclusión. Véase Código Penal de California §404, según enmendado en 1978.

En el derecho angloamericano existían tres delitos relacionados. Eran **la asamblea ilícita, el tumulto** y **el motín. Los mismos se incluyeron en el Código Penal derogado.** La **asamblea ilícita** consistía en reunirse tres o más personas con un plan común en mente que si lo llevaban a cabo generaría un motín. El **tumulto** era el movimiento de las personas que se han reunido ilícitamente para llevar a cabo un designio común; mientras que **el motín** es la **alteración tumultuosa de la paz por dos o más** personas **actuando juntas** en la comisión de un delito mediante **fuerza** o en la ejecución de alguna empresa legal o ilegal de tal manera **violenta, turbulenta** e **ilícita** como para crear la posibilidad de **terror público o alarma.** PERKINS & BOYCE, 481-485. **Cuando se da el delito de motín confunde dentro de sí los delitos de asamblea ilícita y tumulto.** 77 C.J.S. §19 (*Riot*). **Esto explica por qué cuando se aprobó el Código Penal en 1974 se derogaron los artículos 361 y 362 sobre tumulto y reunión ilícita.**[92] (Énfasis nuestro.)

El Código Penal de 1937 prescribía ciertos y determinados delitos que intervenían y reglamentaban el uso de la libertad de expresión. Estos eran el **motín, tumulto** y

---

[92] Nevares-Muñiz, Código Penal de Puerto Rico: revisado y comentado, op. cit., págs. 502-503.

la **reunión ilícita.**   La conducta delictiva allí tipificada

rezaba de la forma siguiente:

>    §359.-(404 Cal.)  **MOTIN, DEFINICION.**   Todo
> empleo de **fuerza** o **violencia**, que **perturbare la
> tranquilidad pública**, o amenaza de emplear tal
> fuerza o violencia, acompañada de la aptitud para
> realizarla en el acto, por parte de dos o más
> individuos, **obrando juntos** y sin autoridad de
> ley, constituye un **motín.**

>    §360.-(405 Cal.)  **[PARTICIPACION] EN MOTINES.**
> Toda persona que tomare parte en un motín,
> incurrirá en pena de presidio por un término
> máximo de dos años, o multa máxima de dos mil
> dólares, o ambas penas a discreción del tribunal.

>    §361.-(406 Cal.)  **TUMULTO. DEFINICION.**   Si dos
> o más personas reunidas y **obrando de acuerdo**,
> **intentaren** o **hicieren ademán** de cometer un **acto
> que de realizarse tendría carácter de motín,** tal
> reunión constituirá un **tumulto.**

>    §362.-(407 Cal.)  **REUNION ILICITA, DEFINICION.**
> Si dos o más personas se reunieren para cometer
> un acto ilegal, separándose después sin
> realizarlo, o sin llevar adelante su ejecución o
> ejecutar un acto ilegal tumultuosa o
> desordenadamente, las personas así reunidas
> constituirán una reunión ilícita.

>    §363.-(408 Cal.)  **PARTICIPACION EN TUMULTO O
> REUNION ILICITA.**   Toda persona que tomare parte
> en un tumulto o reunión ilícita, incurrirá en
> *misdemeanor.*

>    §364.-(409 Cal.)  **PERMANENCIA DE UNA PERSONA
> EN EL SITIO DEL MOTIN, ETC.**   Toda persona que
> continuare presente en el sitio en que hubiere
> ocurrido algún motín, tumulto o reunión ilícita,
> después de haberse amonestado a ésta, conforme a
> la ley, para que se disperse, excepto los
> funcionarios públicos y personas que estuviesen
> prestándole su auxilio para dispersarla,
> incurrirá en *misdemeanor.*

>    §365.-(410 Cal.)  **NEGLIGENCIA EN REPRIMIR
> REUNION ILICITA O TUMULTUOSA.**   Si un funcionario
> público o policía, teniendo noticia de alguna
> reunión ilícita o tumultuosa, de las mencionadas
> en este capítulo, dejare de constituirse en el
> lugar de dicha reunión, o tan cerca de la misma
> como fuere posible sin peligro, y de ejercer la

autoridad de que está investida para reprimirla y arrestar a los delincuentes, incurrirá en *misdemeanor*. (Énfasis nuestro.)

El anterior Código Penal tenía una descripción de conducta tipificada como delito de **motín** similar a la contenida en el Código Penal actual. El término **"dos o más personas obrando juntas sin autoridad de ley"** no implicaba bajo el Código Penal anterior que para la comisión del delito de **motín** se tuviera que establecer **"el designio común"** de esas dos o más personas. El anterior Código Penal contenía el elemento de **"designio común"** de dos o más personas para cometer el delito de **"tumulto"**. No obstante, ese delito de **tumulto** comprendía **el intento** o **realización de un ademán "por dos o más personas reunidas y obrando de acuerdo"** de cometer un acto que, de realizarse, **tendrían el carácter de la conducta tipificada como motín**. El delito de **tumulto** fue eliminado al aprobarse el actual Código Penal el 22 de julio de 1974.

La profesora Dora Nevares Muñiz opina, sobre este asunto, que **"cuando se da el delito de motín confunde dentro de sí los delitos de asamblea ilícita y tumulto"**. (Énfasis nuestro.) Ello explica, según la profesora Nevares Muñiz, por qué cuando se aprobó el actual Código Penal se derogaron las disposiciones específicas sobre **tumulto** y **reunión ilícita**. Si aplicáramos la **regla sobre interpretación declarativa** tendríamos que adscribirle la modalidad **restrictiva** y limitarnos a **entender el lenguaje que claramente se desprende del estatuto, tal y como quedó**

**redactado al ser aprobado**, como la **única expresión** de la **voluntad del legislador**, en **ausencia de una intención legislativa distinta que se desprenda del historial legislativo**. Por ello, al realizar ese ejercicio de interpretación entendemos que la letra del estatuto refleja claramente la voluntad del legislador de excluir el elemento de **"acuerdo o designio común"** al utilizar el lenguaje de **"dos o más personas obrando juntas y sin autoridad de ley"**, como parte de la **actividad delictiva ("actus reus")** tipificada como delito de motín. **La voluntad del legislador** fue el imprimirle **a la aplicación del delito de motín**, como medida que regula el ejercicio **"por dos o más personas"** de la libertad de expresión, de un **ámbito mucho más amplio** que el contenido en el Código Penal anterior.

IV

Tomando en cuenta que estamos ante la presencia de un estatuto penal (delito de motín) que **tiende a restringir y pretende reglamentar** el derecho constitucional a la **libertad de expresión**, es necesario la realización de **un examen riguroso del ámbito** que el Ministerio Público **le ha querido imprimir al mismo**, y **el alcance** de su **aplicación**, en esa forma, al aquí peticionario, en la etapa procesal en que se encuentra el asunto en el foro primario. Nuestro ministerio revisor nos impone la obligación de evaluar las determinaciones del Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones sobre este asunto y el

curso de acción tomado por ambos foros al considerar y resolver los importantes planteamientos de las partes sobre tal asunto. Ambos foros judiciales adoptaron el estándar menos exigente para el Ministerio Público sostener el delito de motín y el más desfavorable al aquí peticionario. Veamos.

El Ministerio Público sostuvo ante el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones, que **dos (2) o más personas** podrían incurrir en **una violación al delito de motín**, en la modalidad de participación directa y activa **(autor inmediato)** o, en la alternativa, en la modalidad de "instigar", "ayudar" y "cooperar" con el que participó directa y activamente **(autor mediato)**.[93] Alegó el Ministerio Público que se comete el delito de motín cuando **dos (2) o más personas** que como **"autores inmediatos"** o **"autores mediatos"** hayan incurrido en forma **directa** o **indirecta** en **"fuerza y violencia"**, describiendo la misma como **aquella conducta que no requiere esfuerzo físico** de la persona, sino que **basta con que tal conducta** produzca **"terror o alarma"** en una **persona promedio**, **perturben la tranquilidad pública** como una **consecuencia probable** de **esa conducta**, cuando **no queriendo tal resultado pudieren preverlo**, y/o en **la alternativa**, cuando **se produce tal resultado, sin quererlo**, por su **imprudencia o descuido, falta de circunspección o impericia** o **por su inobservancia de la ley**. Adujo, que en la modalidad de **"autor mediato"**

una persona podría **"ayudar"**, **"instigar"** y **"cooperar"** con otra persona que **directa y activamente (autor inmediato)** estuviere incurriendo en la conducta antes descrita, **con el simple hecho de utilizar la marca o emblema del grupo** a que **pertenecen ambos;** que está ejercitando su libertad de expresión como grupo, en ejercicio de su libertad de asociación.

El Tribunal de Primera Instancia concluyó que **la participación activa** del aquí peticionario, **junto a otros tres (3) acusados,** lo convirtió en **autor** del delito. Determinó, que éste **no fue un mero observador.** A base de sus inferencias, determinó que llegó al lugar en apoyo del doctor Carlos I. Pesquera Morales para **"cooperar" con él,** y que sus actos afirmativos reflejan que **"ayudó"**, **"apoyó"**, **"instigó"** y **"cooperó"** con éste en la comisión del delito de motín. Sostuvo que tomó su determinación **a base de la prueba de cargo,** que **ubicó al aquí peticionario** en **un grupo de personas** que **estaban pegados a la puerta de la Oficina de la Procuradora de la Mujer,** y que **tuvo acceso al interior de ese edificio.** Concluyó, además, que **la prueba de cargo lo ubicó directamente detrás del doctor Pesquera Morales,** utilizando **"fuerza y violencia"** para lograr acceso al referido edificio, **cosa que lograron juntos.** El Tribunal de Primera Instancia determinó que el aquí peticionario incurrió en **la actividad delictiva ("actus reus")** imputada, a los efectos de una determinación de causa probable para

---

[93] Artículo 35 (a) y (b) del Código Penal de Puerto Rico, 33

acusar, de conformidad al derecho aplicable.   Ello, **en ambas modalidades de autor de un delito "inmediato" y "mediato".** El foro primario **no particularizó el carácter** de la **"fuerza y violencia"** desplegada y **el rol del aquí peticionario** como **"autor inmediato y mediato"** en tal despliegue.   Concluyó, que **perturbó la tranquilidad pública** de los empleados de la agencia pública concernida,  por  haber  sido  esa  **la consecuencia probable de su actividad delictiva** de **"fuerza y violencia",  junto a otros,** en **las modalidades de autoría** ya indicadas,  porque **no tenía que demostrar el Ministerio Público que el peticionario quería perturbar la tranquilidad pública,** bastaba con **que previera que ese era el resultado** de esa conducta **("mens rea").**

El Tribunal de Circuito de Apelaciones concluyó que el **delito de motín** no requiere que **la persona quiera perturbar la  tranquilidad  pública,  basta**  con  que  **esa  sea  la consecuencia natural o probable,** o que **tal resultado hubiese sido previsible.**   Determinó como suficiente, que la prueba de cargo **identificó al aquí peticionario** y **lo ubicó en los eventos** que dan **margen al caso de autos.**

**De la letra** y **el lenguaje del Artículo 261,** <u>supra</u>, y de la **parte general del Código Penal, no surgen guías que contengan estándares explícitos** que dirijan la discreción de la autoridad gubernamental sobre cuál es el **estado mental ("mens rea")** requerido para imponer responsabilidad a una persona que haya incurrido en la **actividad tipificada como**

L.P.R.A. sec. 3172.

**delito de motín ("actus reus"). Tampoco surge del historial legislativo** que hemos examinado **la intención del legislador** dirigida a **formular o establecer esas guías.** Tal situación produce **el potencial** de **aplicación arbitraria** de dicho **estatuto penal** por parte de la autoridad gubernamental. Es impermisible constitucionalmente el dejar en las manos de **policías, fiscales** y **jueces** la resolución en **forma ad hoc** y sobre **bases subjetivas** de cuál **estado mental ("mens rea")** es aplicable a la **actividad tipificada ("actus reus")** en el **delito de motín.** Ello, cuando la aplicación amplia del mismo presenta el potencial de la arbitrariedad y de la intervención indebida o irrazonable del Estado con derechos protegidos por la Primera Enmienda de la Constitución de Estados Unidos y por el Artículo II, Secciones 2 y 3, de la Constitución de Puerto Rico. El **significado incierto** que el **amplio ámbito** de este estatuto penal **("actus reus y mens rea")** le imprime al uso de la libertad de expresión inevitablemente llevará a los ciudadanos a permanecer mucho más lejos de la **zona formulada subjetivamente como ilegal.** El significado incierto de un estatuto penal que pretende reglamentar el uso de la libertad de expresión, que produce el potencial de arbitrariedad en su aplicación por parte de la autoridad gubernamental al ejercer su discreción, lleva a los ciudadanos a permanecer mucho más lejos de aquella área que, en **forma subjetiva y ad hoc,** los **policías, fiscales** y **jueces** entendieran constituye la **zona ilegal.** Por eso las fronteras de **la conducta ("actus reus")** y el **estado mental**

**("mens rea")** requerido para imponer responsabilidad criminal cuando dos o más personas, en uso de su libertad de asociación, están en el ejercicio de su libertad de expresión, tienen que estar **específicamente demarcadas en el estatuto penal.**[94]

Es constitucionalmente impermisible el ámbito amplio de un estatuto penal que intenta reglamentar el uso de la libertad de expresión, cuando requiere una construcción igualmente amplia para salvar su validez. De requerirse tal ejercicio, el estatuto penal en cuestión sería vago.[95] En el caso ante nos el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones aplicaron a la controversia de autos **la intención general** en su modalidad de **consecuencia natural**, o **probable**, **en la alternativa**, o, **también en la alternativa**, **la negligencia** en sus variadas modalidades y manifestaciones. La aplicación de la política pública formulada por el Estado en la tipificación de la conducta delictiva ("actus reus") y el estado mental ("mens rea") aplicable, está sujeta y limitada a la garantía a un debido proceso de ley. Por no contar la autoridad gubernamental con guías que formulen estándares explícitos que dirijan su discreción sobre cuál es el estado mental ("mens rea") aplicable al delito de motín, concluimos que el Tribunal de

---

[94] Broadrick v. Oklahoma, 413 U.S. 601 (1973), 93 S. Ct. 2908 1973).

[95] Virginia v. Kevin Camant Hicks, 123 S.Ct. 2191 (2003), 71 U.S. L.W. 4441 (2003); Hynes v. Oradell, 425 U.S. 610 (1976), 96 S. Ct. 1755 (1976); National Association for the Advancement of Colored People v. Button, 371 U.S. 415 (1962).

Primera Instancia y el Tribunal de Circuito de Apelaciones realizaron una construcción sumamente amplia de ese estatuto penal, sosteniendo el uso de su discreción judicial en una evaluación de naturaleza subjetiva sobre cuál es el estado mental ("mens rea") aplicable.[96] Resolvieron la controversia ante sí sobre la base de que el estado mental aplicable podría ser uno, entre varios de los grados de culpabilidad contemplados en nuestro Código Penal, excluyendo el más vigente para el Estado sostener y el más favorable al aquí peticionario.

## PROCESAMIENTO SELECTIVO

El aquí peticionario planteó ante el Tribunal de Primera Instancia, como fundamento para solicitar la desestimación de la acusación formulada en su contra, que fue sometido a un procedimiento criminal en forma selectiva y por motivo de haber sido Presidente del Partido Nuevo Progresista. Le imputó al Estado la utilización de su maquinaria de procesamiento criminal en una forma constitucionalmente impermisible, con el propósito de discriminar en su contra por motivo de sus ideas políticas. A nivel del Tribunal de Circuito de Apelaciones planteó que de la prueba desfilada surge que en el lugar habían más de cien (100) personas que estaban comprimidas frente y dentro del edificio de la Oficina de la Procuraduría de la Mujer. No obstante, sólo fueron sometidos a un proceso criminal el

peticionario y otros tres (3) líderes del Partido Nuevo Progresista, cuando en el lugar de los hechos otras personas incurrieron en la comisión de delitos y no han sido encausadas. Expresó, que **el delito de motín presupone una "intención específica"** de perturbar la tranquilidad pública. A esos efectos, puntualizó que la interpretación en contrario padece de vicio constitucional. Arguyó, además, que su encausamiento, a través del significado impartido por el Estado a los elementos del delito de motín, constituye una restricción impermisible de los derechos que le garantiza la Primera Enmienda de la Constitución de los Estados Unidos. Finalmente, sostuvo que bajo ninguna circunstancia se le puede imprimir a ese estatuto penal un significado que implique que se requiere como elemento la **"intención general"** para incurrir en violación al mismo.

El procesamiento criminal selectivo es materia de una defensa afirmativa a **alegarse** y **probarse** por el imputado en el foro de primera instancia, que conlleva establecer un efecto discriminatorio en la aplicación de la ley a su caso y que el proceso en su contra fue motivado por esas razones.[97]

El caso de autos se encuentra en la etapa inicial del procedimiento penal ante la Sala Superior del Tribunal de Primera Instancia, con la formulación de una acusación por delito grave (motín), después de haberse determinado causa probable para acusar al aquí peticionario por ese delito.

[96] Íd.

El peticionario levantó, ante el Tribunal de Primera Instancia, el planteamiento de procesamiento selectivo precisamente frente a la acusación formulada en su contra, que persigue la celebración de un juicio plenario dirigido a la presentación de prueba de cargo para sostener, más allá de duda razonable, las alegaciones contenidas en el referido pliego acusatorio. Durante la vista celebrada ante la Sala Superior de San Juan del Tribunal de Primera Instancia, para dilucidar la moción de desestimación de la acusación, fue presentada en evidencia por el aquí peticionario copia de la transcripción de la prueba oral desfilada durante la celebración de la vista preliminar por el Ministerio Público, que junto a la prueba desfilada por el Estado y su teoría sobre el significado amplio del ámbito del delito de motín, aplicable al aquí peticionario, ameritaba que dicho Tribunal entendiera y resolviera tal planteamiento. Somos del criterio que las actuaciones, posiciones y prueba desfilada por el Ministerio Público y aquella desfilada por el aquí peticionario durante los procedimientos ante la Sala Superior de San Juan del Tribunal de Primera Instancia, produjeran el cuadro fáctico y peso probatorio necesarios para que ese Tribunal atendiera y resolviera tal asunto. En este caso existe un señalamiento directo y específico del aquí peticionario ante el Tribunal de Primera Instancia sobre procesamiento selectivo. Por todos es conocida la amplia facultad que proseemos de ir más allá de las

---

[97] Pueblo v. Rexach Benítez, supra;  Wayte v. U.S., supra.

infracciones de la ley o quebrantamientos de formas señaladas por las partes con el más alto fin de evitar injusticias.[98]

La prueba de cargo desfilada durante la vista preliminar reflejó que frente al edificio y dentro de la Oficina de la Procuraduría de la Mujer habían muchas personas "apilladas" [sic], que uno de los testigos describió como un grupo de "más de cien". Como parte de ese gran número de personas, se encontraban allí miembros de la prensa con sus cámaras, videos y micrófonos, quienes estaban excitados y trataban de entrar todo el tiempo a la Oficina de la Procuraduría de la Mujer. De las fotografías que se encuentran en los autos se desprende el cuadro fáctico que describieron los testigos de cargo. Se puede apreciar en algunas de ellas un gran número de personas frente al edificio de la agencia pública en cuestión, participando en una manifestación. Otras fotografías reflejan un gran número de personas dentro del edificio y en la escalera que conduce a la planta alta del mismo. Detrás de ese grupo de personas se puede apreciar un número más grande de personas. Todas estas personas habían formado una masa humana compacta, porque estaban tan comprimidos unos con otros, que la palabra "apillados" [sic] que usaron los testigos de cargo para describir la situación es muy adecuada. De las fotografías se puede apreciar la presencia en el lugar, en

---

[98] *Pueblo v. Colón Obregón*, 102 D.P.R. 369 (1974); *Pueblo v. Serrano Nieves*, 93 D.P.R. 56 (1966).

algunas, al aquí peticionario, a líderes del Partido Nuevo Progresista, de algunos periodistas, y además de muchas otras personas que participaban en la manifestación.

El Ministerio Público activó su maquinaria de procesamiento criminal contra el aquí peticionario y tres (3) líderes del Partido Nuevo Progresista. Actuó sobre la base de que **perturbaron la tranquilidad pública** con el uso de **"fuerza y violencia"**. Argumentó en sus escritos ante el Tribunal de Primera Instancia, en oposición a la solicitud de desestimación, que el significado de **"fuerza y violencia"** del delito de motín **no exigía** que tuviera que demostrar **el uso de esfuerzo físico**, pues bastaba con probar que **su conducta** había producido **"terror y alarma"** en una **persona promedio**. **No especificó ni describió** en esos escritos en qué **consiste** tal **"fuerza y violencia"**. No obstante, de la denuncia y el pliego acusatorio formulado en contra del aquí peticionario, alegó específicamente sobre tal asunto que éste utilizó **"fuerza y violencia"**, consistente **en que, en unión a otras personas que lo acompañaban, penetró e irrumpió** en la Oficina de la Procuraduría de la Mujer, ubicado en la Calle Tetuán Núm. 253 del Viejo San Juan, **utilizando diferentes partes de su cuerpo,** mediante **puños, codazos, manotazos, empujones** y de **forma atropellante, logrando acceso** a la antesala de dicha oficina, **resultando lastimadas emocional y físicamente varias personas,** siendo **estos hechos** contrarios a la ley, lo que constituye **el delito de motín.** En cuanto al aquí peticionario, alegó que

**participó directa y activamente (autor inmediato)** en la comisión del delito o, en **la alternativa**, incurrió en la referida infracción al **"instigar", "ayudar" y "cooperar" (autor mediato)** con el doctor Pesquera Morales, que alegadamente participaba directa y activamente en la actividad delictiva. Consideró, que el aquí peticionario incurrió en el delito de motín, aunque **no hubiera sido su propósito perturbar la tranquilidad pública**, pues **bastaba con que pudiera prever** que esa era la **consecuencia probable** de su ejercicio de **"fuerza y violencia"** en **forma directa y activa (autor inmediato)** o, en **la alternativa**, como **"cooperador" (autor mediato)**. Alegó, que el aquí peticionario produjo **la perturbación de la tranquilidad pública**, en las **dos modalidades de autoría** antes indicada, en **la alternativa**, y como resultado delictuoso, aún **sin quererlo, por una, o en conjunto, con otras varias alternativas**, a saber: **imprudencia o descuido, falta de circunspección o impericia, o por inobservancia de la ley**. Expresó, que en la modalidad de **"autor mediato"** bastaba con que usara la misma **"marca o emblema"** que identificaba a aquel que **participa directa o activamente en la conducta delictiva** y que a la misma vez identifica a otras personas que se encuentran como grupo en una manifestación. Bajo el significado que el Ministerio Público le imprimió al ámbito del delito de motín y le aplicó al aquí peticionario, y analizada la prueba de cargo presentada por el Estado durante la vista preliminar, le debió aplicar el mismo

criterio a un gran número de personas allí presentes que identificaron y describieron los testigos de cargo y que reflejan las fotografías, como incursos en una conducta igual o similar a la observada por el aquí peticionario, y que no fueron sujetos de procedimiento criminal alguno.[99]

Lo establecido por el aquí peticionario con la presentación en evidencia de la transcripción de la prueba oral desfilada en la vista preliminar, por el propio Ministerio Público a través de sus escritos ante el Tribunal de Primera Instancia y por la prueba desfilada por éste durante la vista evidenciaria ante ese foro, para fundamentar y sostener su oposición a la moción de desestimación presentada por el aquí peticionario, estableció prima facie fuertes indicadores de que existe un fundamento aparentemente genuino de que estamos ante un impermisible encausamiento criminal selectivo por razones políticas.[100] Una vez establecido prima facie tal cuadro fáctico, el curso de acción a tomar por el foro primario no es ordenar el archivo de la causa criminal. No obstante, tenía que permitirle al Ministerio Público que demostrara la

---

[99] A modo ilustrativo, cabe mencionar la declaración de testigos de cargo sobre otras personas, que no fueron acusadas por lo actos ocurridos ese día. Se describe la conducta de esas personas como utilizando "fuerza y violencia", mientras que el peticionario lo colocan solamente como presente en el lugar. Véase, Apéndice del recurso de Certiorari, págs. 211, 212, 334, 483, 491, 496, 499, 502, 506, 510, 511, 521, 531, 535, 559, 572, 591, 594, 596, 597, 598, 629, 651, 652, 670, 673, 677, 681, 695, 721.

[100] U.S. v. Amstrong, 517 U.S. 456 (1996), 116 S.Ct. 1480 (1996); Wayte v. U.S., supra.

legitimidad y validez de su actuación.[101]  Concluimos, que

erró el Tribunal de Circuito de Apelaciones al no resolver

en sus méritos tal asunto, dentro de su ministerio revisor.

Sobre este tema, y dentro de un marco fáctico similar,

en Pueblo v. Rexach Benítez, supra, expresó en su Opinión

Disidente el Juez Asociado señor Rebollo López, lo

siguiente:

> La mayoría del Tribunal, en un intento de contrarrestar nuestro señalamiento sobre "procesamiento selectivo" del Senador Rexach Benítez, expresa, en síntesis, que: (1) dicho planteamiento **no ha sido levantado por el Senador Rexach Benítez**, esto es, que ha sido planteado motu proprio por el Juez suscribiente a "destiempo"; (2) la posición que el Juez suscribiente hoy asume –de "resolver" el señalamiento en esta etapa de los procedimientos– resulta ser, conforme la Mayoría, contradictoria con la posición que asumimos en el pasado en el caso *Hernández Colón v. Srio. de Hacienda*, ante; (3)"la *prominencia pública* del acusado y el hecho de que sea *miembro de una minoría*, o la *supuesta ausencia de acusación a otros supuestos violadores, de por sí,* tampoco [le] permite [al Tribunal] pasar juicio sobre la alegación de discrimen traída por la opinión disidente", (énfasis suplido y en el original) opinión mayoritaria, pág. 281, y (4) lo "ocurrido en el Senado de Puerto Rico no impedía que el Departamento de Justicia investigara y formulara los cargos que procedieran en derecho". Opinión mayoritaria, pág. 282.
>
> Verdaderamente resulta ser innecesario extenderse mucho en la "refutación" de dichos señalamientos. Los mismos realmente constituyen un lastimoso esfuerzo de la mayoría por justificar su incomprensible actitud de inacción –por segunda ocasión en el corto término de cinco (5) años– ante la cruda, y jurídicamente indeseable, utilización por parte del Estado del proceso criminal como mecanismo de persecución política en este País.

---

[101] United States v. Saade, 652 F. 2d 1126, 1135 (1er Cir. 1981).

V

## MOCION DE DESESTIMACION BAJO LA REGLA 64(P) DE PROCEDIMIENTO CRIMINAL

Una vez se decide celebrar la vista preliminar, para que el magistrado que preside la misma pueda ordenar la detención del imputado de delito y sea procedente la formulación de una acusación por un delito grave, la prueba debe demostrar que existe causa probable para creer que cometió un delito y que el imputado fue su autor. Vázquez Rosado v. Tribunal Superior, 100 D.P.R. 592 (1972).

El Tribunal de Primera Instancia entendió que el caso de autos no se trata de uno que exista ausencia total de prueba. Para derrotar la presunción legal de corrección que cobija a la determinación de causa probable para acusar realizada por el juez instructor, el acusado peticionario tenía que demostrarle al juez que entendió en la vista preliminar celebrada como consecuencia de la solicitud de desestimación de la acusación al amparo de la Regla 64 (p) de Procedimiento Criminal, supra, que existe ausencia total de prueba en cuanto a uno o más de los elementos del delito de motín.[102]

Este Tribunal ha dispuesto claramente los requisitos bajo los cuales está supeditado el examen judicial realizado por parte del Tribunal de Primera Instancia de una Moción al amparo de la Regla 64 (p) de Procedimiento Criminal, supra.

---

[102] Pueblo v. Rivera Alicea, 125 D.P.R. 37 (1989).

En <u>Pueblo v. Rivera Alicea</u>, <u>supra</u>, formulamos como norma lo siguiente:

> El análisis adecuado, para resolver una moción de desestimación al amparo de dicha regla, **requiere examinar la prueba de cargo y defensa vertida en la vista preliminar y la producida por el imputado durante la vista de desestimación.** A la luz de los elementos del delito imputado el juzgador debe determinar si tal prueba establece la **probabilidad** de que estén presentes **todos** los elementos, a saber, la probabilidad de que se haya cometido tal delito imputado. Concomitante a dicho examen, debe determinar si hay prueba que probablemente conecte al imputado con el delito probablemente cometido. (Énfasis nuestro.)

De la transcripción de la prueba de cargo desfilada durante la celebración de la vista preliminar se desprende que los testigos que utilizó el Ministerio Público para lograr la determinación de causa probable para acusar al aquí peticionario por el delito de motín, declararon lo siguiente:

> ...
>
> P   ¿Cómo estaba el ambiente para ese momento?
>
> R   Caldeado obviamente, estaba [sic] mucho grito, que no los dejen pasar, que se queden adentro, continuaba...según se excitaba la gente, pues el señor Pesquera volvía y dada otra vez cantazos en la puerta y empujones. Todo el tiempo la puerta se mantuvo en empujones. Ya para ese entonces estaba **el Sr. Leo Díaz** también detrás del Sr. Carlos Ignacio Pesquera.
>
> P   ¿Quién es el **Sr. Leo Díaz**?
>
> R   **El Sr. Leo Díaz, el señor que está al lado del Sr. Edwin Mundo.** El caballero que está al lado del Sr. Edwin Mundo.
>
> P   ¿De qué color es su camisa?
>
> R   Azul también.

Para fines de la grabación, Vuestro Honor, que refleje **que se identificó al Sr. Leo Díaz.**[103]

...

P    Cuando usted dice "adentro" a qué se refiere.

R    Adentro de la oficina, adentro, ya no en el "lobby", dentro de las oficinas. Sale este joven, muchacho joven y le hace frente y le dice dos o tres cosas a Dennis.

R    ¿Quién es esa persona?

P    Es un muchacho joven, creo que es el presidente de los estadistas, la juventud estadista del partido republicano de Puerto Rico.

P    ¿Y qué pasó?

R    Ahí llega la Comandante Wanda Rivera y el otro teniente, que desconozco su nombre, uno trigueño él con camisa blanca, con su casco bien puesto y entonces logran dominar al muchacho y lo sacan hacia fuera. Luego de eso, que Pesquera logra poner su... después de haberse llevado a dos o tres personas, logra poner su bandera, salen hacia fuera y salen con ellos, al ellos salir termina el motín y el caos y el desasosiego que allí existió. Tan pronto ellos salen vuelve la paz.

P    ¿Cuántas personas o usted reconoce qué personas lograron acceso a la primera planta para poner la bandera?

R    El **señor Pesquera, la señora Jennifer**, estaba el **Sr. Rivera Schatz**, estaba... **había bastante gente de ellos arriba; la prensa, obviamente tirando fotos,** pero yo te podría decir que... y **Leo Díaz estuvo arriba también,** ya en primer nivel...

P    **¿Cuando se abrió la puerta dónde estaba el Sr. Leo Díaz?**

R    **Detrás del Sr. Carlos Ignacio Pesquera, justamente detrás.**[104]

---

[103] Apéndice del recurso de <u>Certiorari</u>, págs. 501-502.

...

LCDO. ALONSO SANTIAGO:

P    ¿Señor, a preguntas del fiscal usted dice
     que en un momento dado la puerta se abre y
     que entran las personas?

R    **Que yo abrí la puerta.**

P    **Usted abrió la puerta, usted abrió la
     puerta.  Y entraron las personas.**

R    **Eso es correcto.**

P    **Policías, periodistas...**

R    **Los que estaban al frente, todos ellos que
     estaban al frente.  Pesquera, el primero que
     entró y así por el estilo.**

P    **Y también usted vio entrar con él policías
     también.**

R    **Entró todo el mundo, todo el que estaba
     allí.**

P    **Todo el que estaba allí.    ¿Pero habían
     policías también allí?**

R    **Sí, sí.**

P    **Y estaban subiendo por allí.**

R    **Se metieron a ayudar a poner la... a parar
     el...**
P    **Pero subieron.**

R    **Sí, se metieron, claro.**

P    **¿Y ellos se metieron a ayudar a poner la
     bandera?**

R    **A forcejear, a parar el gentío, ayudar.**

P    Le voy a presentar unas fotos que creo que
     están como Exhibit 1-F, 1-B y 1-G para que
     los mire.  ¿Las vio?

R    Sí.

---

[104] Íd., págs. 509-510.

P    Le pregunto si en este instante que está sucediendo esto que usted está viendo en la foto...

MINISTERIO PUBLICO:

    ¿Cuál foto?

LICENCIADO ALONSO SANTIAGO:

P    ...en las fotos de ahorita...

MINISTERIO PUBLICO:

    Las tres.

LCDO. ALONSO SANTIAGO:

P    ... **las tres fotos, si los compañeros o los jefes de esa agencia le están diciendo "déjalos subir, déjalos subir".**

R    **¿En estos momentos?**

P    **Sí.**

R    **No, en estos momentos no.**

P    **No en estos momentos.  Le pregunto si en esa foto y en algún momento dado usted ve al Sr. Leo Díaz ahí.**

R    **No, no se ve a Leo Díaz en ese momento.**

P    **No lo ve.  Ahora le voy a preguntar si en el Exhibit 1-H, mire a ver qué es lo que refleja el Exhibit 1-H.  ¿Si ahí lo ve?**

R    **No, aquí tampoco aparece.**

P    **Tampoco.  Le voy a presentar el Exhibit 1-1 y el 1-E y el 1-K y el 1-A y el L.  ¿Lo vio?**

R    **Sí.**
P    **¿Dónde está?**

R    **Si no me equivoco, es este caballero que está aquí entre Iris Miriam Ruiz, el teniente y Dennis, es él.  Este caballero que está aquí es él.**

P    **¿Lo que usted nos enseña es una cabeza?**

R    **Ese.**

P      **¿Una cabeza?**

MINISTERIO PUBLICO:

Juez, pero aquí el compañero no puede estar testificar [sic].

LCDO. ALONSO SANTIAGO:

No, pero es una...  Perdóneme, es una...

P    Explíquele a la Juez.

MINISTERIO PUBLICO:

El compañero lo que está diciendo "es una cabeza".

TESTIGO:

R    Según en la posición en que él estaba, que era él que estaba detrás del señor Carlos Pesquera.

LCDO. ALONSO SANTIAGO:

P    ¿Qué es lo que se ve?

MINISTERIO PUBLICO:

Lo que pasa que el compañero preguntó...

TESTIGO:

R    Pues, eso es lo que se ve, pero él estaba.

MINISTERIO PUBLICO:

... y entonces él le contestó.

HON. JUEZ:

Ya respondió, licenciado.

LCDO. ALONSO SANTIAGO:

P      **Enséñeselo a la Juez.   ¿Vio el rostro de él ahí?**

R      **Ahí en la foto, no.**

P    **No.   Y ahora el Exhibit 2-1 y el 1-Q.   ¿Qué es lo que usted ve... qué es lo que refleja esa foto?**

R    **Mucha gente en la carretera.**

P    **¿Esas eran las personas que estaban allí? Sí.**

R    **Entrégueselo al... (ininteligible).   ¿Esos son los manifestantes?**

R    **Eso es así.**

P    **Eso es así.   ¿Estaban ellos haciendo conducta desordenada, esos manifestantes?**

R    **Hasta lo que se ve en la foto, no.**

P    **No.**[105]

                        ...

MINISTERIO PUBLICO:

P    Pero diga lo que usted vio, que usted indica que estaba por encima de las demás personas.

R    Porque él estaba sobre algo que lo elevaba a un nivel mayor y él no mide 7 pies, ni 8 ni 9.

P    ¿Después de eso usted lo ve en dónde?

R    Justo en la puerta de entrada donde... ahí es que él le dice a los periodistas "nosotros los dejamos entrar a ustedes, ahora ustedes nos tienen que garantizar entrar".

P    ¿Usted sabe dónde está ese señor el día de hoy?

R    Creo que está aquí.

P    ¿Cree o está segura?

R    Estoy segura.

P    Pues, búsquelo y señálelo, por favor.

---

[105] Íd., págs. 595-598.

R    Es la persona que está vestida con blusa azul y una corbata de varios colores con traje negro, que en este momento me hace una guiñada.

P    El señor que usted indica que estaba allí, indique las personas que usted vio en ese momento además de Edwin Mundo, qué personas estaban allí que usted reconozca.

R    Que yo reconozca, pues, ahí estaba la Sra. Miriam Ramírez, estaba el señor Pesquera, estaba un joven que después me indicaron que era el hijo del señor Pesquera, estaba el Sr. Leo Díaz...

P    **¿Estaba el Sr. Leo Díaz?  ¿Dónde usted lo vio allí, en ese sitio dónde lo ve?**

R    **Ubicado entre las personas que estaban después de los que estaban pegados a la puerta.**

P    **¿Este señor usted lo ve, dónde está al día de hoy?**

R    **Aquí.**

P    **¿Podría también ubicar dónde está, por favor?**

R    **Sí, al lado del Sr. Edwin Mundo.**[106]  (Énfasis nuestro.)

...

No existe dentro de la transcripción de la prueba oral otra alusión al aquí peticionario por los testigos de cargo desfilados durante la celebración de la vista preliminar. De las fotografías presentadas en evidencia, en las cuales aparece el aquí peticionario, no surge rol alguno de su parte en capacidad de "autor inmediato o mediato" en la comisión del delito de motín.[107]

---

[106] Íd., págs. 669-670.

A tenor con lo anterior, concluimos que erró el Tribunal de Circuito de Apelaciones al confirmar al Tribunal de Primera Instancia en su determinación de declarar sin lugar la moción de desestimación presentada por el aquí peticionario. Existe **ausencia total en la prueba de cargo** desfilada durante la vista preliminar, en cuanto al aquí peticionario, sobre el elemento de "fuerza o violencia" que contempla el Artículo 261, supra, como parte de la actividad delictiva ("actus reus") y del estado mental de intención específica ("mens rea"), necesarios para incurrir en su infracción, a tenor con el significado que estamos obligados a imprimirle por imperativo de la garantía a un debido proceso de ley y de la norma estatutaria sobre interpretación de los estatutos penales vigente en Puerto Rico.

## VI

Por todo lo antes expuesto, expediríamos el auto de certiorari solicitado y revocaríamos la sentencia dictada por el Tribunal de Circuito de Apelaciones. Desestimaríamos la acusación presentada ante el Tribunal de Primera Instancia contra el aquí peticionario por el delito de motín.

BALTASAR CORRADA DEL RÍO
Juez Asociado

---

[107] Íd., págs. 717-721. Fotografías identificadas con los números 14, 15, 16, 18, 19, 32, 37 y 43.

EFRAÍN E. RIVERA PÉREZ
Juez Asociado